IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

| | | |
|---|---|---|
| STEVEN WASHBURN and JEANETTE WASHBURN, husband and wife; WASHBURN COMPANY, INC., d/b/a WASHBURN CUSTOM BUILDERS; and SOUTHERN ARIZONA HOMEBUILDERS ASSOCIATION, | ) ) ) ) ) ) | 2 CA-CV 2003-0107 DEPARTMENT B  O P I N I O N |
| Plaintiffs/Appellants, | ) ) | |
| v. | ) ) | |
| PIMA COUNTY, a body politic, | ) ) | |
| Defendant/Appellee. | ) ) ) | |

APPEAL FROM THE SUPERIOR COURT OF PIMA COUNTY

Cause No. C-20030754

Honorable Jane L. Eikleberry, Judge

AFFIRMED

---

Haralson, Miller, Pitt, Feldman & McAnally, P.C.
  By Gerald Maltz and Stephen Golden                                             Tucson
                                                  Attorneys for Plaintiffs/Appellants

Barbara LaWall, Pima County Attorney
  By Christopher Straub                                                         Tucson
                                                  Attorneys for Defendant/Appellee

---

E C K E R S T R O M, Judge.

¶1 Appellants Steven and Jeanette Washburn, the Southern Arizona Homebuilders Association (SAHBA), and Washburn Company, Inc. (collectively the Washburns), appeal from the trial court's order granting summary judgment in favor of appellee Pima County. The Washburns contend on appeal that the county lacked statutory authority to adopt an ordinance requiring builders of single-family homes to incorporate design features allowing for greater wheelchair access and that the ordinance violates the Arizona Constitution. We affirm.

### Background

¶2 On appeal from a grant of summary judgment, we view the facts and all reasonable inferences in the light most favorable to the party opposing the motion. *Pleak v. Entrada Property Owners' Ass'n*, 205 Ariz. 471, ¶2, 73 P.3d 602, ¶2 (App. 2003). In February 2002, the Pima County Board of Supervisors adopted Ordinance 2002-2, the Inclusive Home Design Ordinance, which was apparently modified by Pima County Ordinance 2002-72. Among its other effects, the ordinance promulgated building requirements applicable to the construction of new, single-family homes in unincorporated areas of Pima County. It did so by adopting selected construction standards found in the American National Standards Institute's (ANSI) publication A117.1, *Accessible and Usable Buildings and Facilities* (the ANSI standards), published by the International Code Council (ICC). The adopted provisions require that newly constructed homes incorporate design features that allow people in wheelchairs to more easily enter and use the homes. These features include "doorways wide enough to permit wheelchair access, electrical outlets reachable by a wheelchair-bound person, and bathroom walls reinforced to permit installation of grab bars." The Washburns admit that requiring these features in multi-family

2

residential facilities and places of public accommodation serves an important government interest but challenge application of the requirements to single-family homes.

¶3        The Washburns applied for a permit to build a single-family home, but the proposed design failed to comply with the ordinance, and the county denied the application. They later filed a declaratory judgment and special action complaint in which they asked the trial court to declare that the county lacked statutory authority to adopt the ordinance and that it violated both the Equal Protection and Privacy Clauses of the Arizona Constitution. Ariz. Const. art. II, §§ 8, 13. The trial court granted the Washburns' request for resolution of the special action complaint by an order to show cause (OSC) hearing pursuant to Rule 4(c), Ariz. R. P. Special Actions, 17B A.R.S. The county filed a motion for summary judgment and objected to resolving the complaint by OSC. Following arguments on the OSC, the trial court issued an under-advisement ruling, essentially granting summary judgment in favor of the county. In so ruling, the court concluded that the resolution of another case in which SAHBA had participated barred the Washburns from challenging the county's statutory authority to adopt the ordinance. The court also found that the ordinance was constitutional. Because it is clear from the record that the trial court denied the Washburns' request for declaratory relief, we need not determine whether the trial court erred in accepting jurisdiction of their special action complaint, an argument the county raised only in its motion for summary judgment. *See* Ariz. R. P. Special Actions 1(a) ("Except as authorized by statute, the special action shall not be available where there is an equally plain, speedy, and adequate remedy by appeal . . . ."). Our review focuses instead on whether the trial court properly granted summary judgment in the county's favor.

## Standard of Review

¶4        Summary judgment is proper if the evidence presented by the party opposing the motion has so little probative value, given the required burden of proof, that reasonable jurors could not agree with the opposing party's conclusions. Ariz. R. Civ. P. 56(c)(1), 16 A.R.S., Pt. 2; *Orme Sch. v. Reeves*, 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990). In reviewing a grant of summary judgment, we determine *de novo* whether any genuine issues of material fact exist and whether the trial court erred in applying the law. *Bothell v. Two Point Acres, Inc.*, 192 Ariz. 313, 316, 965 P.2d 47, 50 (App. 1998).

## Preclusion

¶5        The Washburns first contend the trial court erred in determining either *res judicata* or collateral estoppel precluded them from asserting their statutory claims. These doctrines, also referred to as claim and issue preclusion, preclude a party from relitigating a claim or an issue as a result of previous litigation. *See Smith v. CIGNA HealthPlan of Ariz.*, 203 Ariz. 173, ¶¶22, 25, 52 P.3d 205, ¶¶22, 25 (App. 2002). The county relies on the outcome of a lawsuit filed in the United States District Court for the District of Arizona in which SAHBA had participated. *See Garber v. Pima County*, No. CV 02-489 TUC FRZ (order filed October 11, 2002). The district court found that the plaintiffs, including SAHBA, had failed to state a claim upon which relief could be granted but ultimately dismissed the case for lack of subject matter jurisdiction. *See id.*

¶6        Relying on *Chicot County Drainage District v. Baxter State Bank*, 308 U.S. 371, 60 S. Ct. 317, 84 L. Ed. 329 (1940), the county argues that the Washburns were precluded from bringing this action because they failed to appeal the district court's determination that it lacked subject matter jurisdiction over the federal lawsuit. In that case, the defendant had filed a

4

voluntary bankruptcy action to allow it to reorganize its debt. After the reorganization plan was approved by the defendant's creditors and affirmed by the district court, the Supreme Court declared unconstitutional the statute under which the bankruptcy court had proceeded. The plaintiff creditor then filed an action in the district court to collect on bonds originally issued by the defendant that had been extinguished under the reorganization plan. The plaintiff prevailed in the trial court, but the Supreme Court reversed, holding that, at the time of the bankruptcy proceedings, the district court had possessed "authority to pass upon its own jurisdiction[,] and its decree *sustaining jurisdiction against attack*, while open to direct review, is res judicata in a collateral action." *Chicot County Drainage Dist.*, 308 U.S. at 377, 60 S. Ct. at 320, 84 L. Ed. at 334 (emphasis added).

¶7 Unlike in *Chicot County Drainage District*, however, the district court in the federal case ruled that it lacked subject matter jurisdiction over the merits of that case. Although SAHBA could have challenged that ruling on direct appeal, it instead filed this action. Citing *Wages v. Internal Revenue Service*, 915 F.2d 1230, 1234 (9th Cir. 1990), the Washburns argue that the district court in the federal case lacked authority to enter a binding decision on the merits once it determined it lacked subject matter jurisdiction. *Wages* is a corollary to *Chicot County Drainage District* and holds that, once a court determines it lacks subject matter jurisdiction over a particular case, it has no authority whatsoever to address the merits of the case. *Wages*, 915 F.2d at 1234 ("[A] Judge who concludes that subject matter jurisdiction is lacking has no power to rule alternatively on the merits of a case."). Because the district court in the federal case ruled that it lacked subject matter jurisdiction over that action, it was precluded from addressing the merits. *Id.* Accordingly, neither *res judicata* nor collateral estoppel precluded the Washburns from

5

bringing this action. The Washburns' failure to appeal the district court's dismissal is immaterial. Although the trial court erroneously agreed with the county that the Washburns were precluded from bringing their statutory claims, we will affirm the judgment if it was correct for any reason. *Logerquist v. Danforth*, 188 Ariz. 16, 18, 932 P.2d 281, 283 (App. 1996). Accordingly, we turn to the merits of the Washburns' statutory claims.

## Statutory Interpretation

¶8   The legislature authorized counties to adopt building codes but "limited [that authority] to the [adoption of] . . . [a]ny building, electrical or mechanical code that has been promulgated by any national organization or association that is organized and conducted for the purpose of developing codes." A.R.S. § 11-861(A), (C)(1). The Washburns challenge the county's adoption of the ANSI standards, which, through mandatory language, set forth a comprehensive collection of rules for builders to facilitate building access to people confined to wheelchairs. The Washburns contend that the county could not adopt the ANSI standards under § 11-861 because ICC neither titled nor classified those standards as a "code." Whether the legislature authorized the county to adopt requirements like the ANSI standards is a question of law subject to our *de novo* review. *See Hohokam Irrigation and Drainage Dist. v. Ariz. Pub. Serv. Co.*, 204 Ariz. 394, ¶5, 64 P.3d 836, ¶5 (2003).

¶9   The principal goal in interpreting a statute is to ascertain and give effect to the legislature's intent. *Pleak*, 205 Ariz. 471, ¶7, 73 P.3d 602, ¶7. To do so, we first examine the statute's language. *Lowing v. Allstate Ins. Co.*, 176 Ariz. 101, 103-04, 859 P.2d 724, 726-27 (1993). Because § 11-861 is silent as to what the legislature intended a "code" to comprise, we find the statute ambiguous and consider other factors such as the statutory scheme, the statute's

6

subject matter, historical context, effects and consequences, and spirit and purpose. *See Sanderson Lincoln Mercury, Inc. v. Ford Motor Co.*, 205 Ariz. 202, ¶11, 68 P.3d 428, ¶11 (App. 2003).

**¶10** "Statutes relating to the same subject matter should be read *in pari materia* to determine legislative intent and to maintain harmony." *Goulder v. Ariz. Dep't of Transp. Motor Vehicle Div.*, 177 Ariz. 414, 416, 868 P.2d 997, 999 (App. 1993), *aff'd*, 179 Ariz. 181, 877 P.2d 280 (1994). The Washburns note that A.R.S. § 9-802, enacted about thirty years before § 11-861, arguably allows cities to adopt, among other things, building regulations of the nature the county adopted here. In connection with that section, the legislature provided that a code is

> a published compilation of rules or regulations prepared by a technical trade association and includes any building code, electrical wiring code, health or sanitation code, fire prevention code, inflammable liquids code, code for slaughtering, processing and selling meat and meat products or for production, pasteurizing and sale of milk and milk products, or other code which embraces rules and regulations pertinent to a subject which is a proper subject of municipal legislation.

A.R.S. § 9-801(1). The Washburns point to the broad function-based language the legislature used to define adoptable codes in this section relating to municipalities, contrast it with the lack of any specific definition for "code" in the section relating to counties, and argue that the difference demonstrates the legislature's intent to provide counties with markedly less discretion in crafting an appropriate building code. Specifically, the Washburns note that cities are authorized to adopt any "published compilation of rules or regulations prepared by a technical trade association," § 9-801(1), but argue that counties may only adopt guidelines that are specifically characterized by national technical organizations as "codes."

7

¶11    We presume the legislature is aware of existing statutes when it enacts new statutes, and we presume the legislature intends to change the law when it substantively changes the language of a statute. *Prudential v. Estate of Rojo-Pacheco*, 192 Ariz. 139, 149, 962 P.2d 213, 223 (App. 1997); *Brousseau v. Fitzgerald*, 138 Ariz. 453, 455, 675 P.2d 713, 715 (1984). However, we do not view the mere failure of the legislature to amplify the meaning of the word "code" in § 11-861(C)(1), the provision relating to counties, as reflecting an intent to discard its previous understanding of the meaning of that word as articulated in the provision relating to cities.

¶12    In *Rotter v. Coconino County*, 169 Ariz. 269, 818 P.2d 704 (1991), our supreme court discussed the relationship between a county zoning ordinance that regulated nonconforming uses and the state enabling statutes. The court noted that, while the legislature had expressly announced that the "'elimination of nonconforming uses in a zoned [municipal] district is for a public purpose,'" *id.* at 276 n.7, 818 P.2d 711 n.7, *quoting* A.R.S. § 9-462.02, the legislature had never articulated a similar policy with respect to county zoning decisions. The court found, however, that both governmental subdivisions were similarly enabled to exercise their police powers to zone and to determine suitable permissible uses. *Id.* In the absence of express legislation to the contrary, the court declined to announce a nonconforming use policy that varied between types of governmental authorities. Instead, the court found that the legislature had intended to adopt a uniform land-use policy and did not limit a county's authority to exercise its police power merely because the legislature had less artfully articulated the scope of county authority. *Id.*

8

¶13        Like the statute addressed in *Rotter*, § 11-861 entitles counties to determine and implement policies intended to further the general health, safety, and welfare of their residents. *See Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 387, 47 S. Ct. 114, 118, 71 L. Ed. 303, 310 (1926); *Emmett McLoughlin Realty, Inc. v. Pima County*, 203 Ariz. 557, ¶11, 58 P.3d 39, ¶11 (App. 2002). Within the confines of guidelines promulgated by national associations organized and conducted for the purpose of developing codes, the legislature has enabled both counties and municipalities to determine regionally tailored building policy, to identify specific design elements that further policy objectives, and to require builders to incorporate those elements. Thus, cities' and counties' enabling statutes rest on the same underlying policy considerations.

¶14        Just as the appellants in *Rotter* asked the supreme court to draw far-reaching conclusions from the legislature's inclusion of one clause in a city enabling statute and its omission from a comparable county enabling statute, the Washburns ask this court to draw a similar far-reaching conclusion from the legislature's failure to elaborate on the definition of the word "code" in § 11-861(C)(1) when it had done so in the comparable statute relating to municipalities. Following the supreme court's example in *Rotter*, we decline to assume any legislative intent from the mere omission of surplus explanatory language in the statute relating to counties when the two statutes in question have such obviously similar goals.

¶15        Nor does our function-based reading of the word "code" render superfluous the second mechanism by which a county may adopt a building code. *See State v. McKeon*, 201 Ariz. 571, ¶17, 38 P.3d 1236, ¶17 (App. 2002) ("Whenever possible, we construe statutes so as not to render any clause, sentence, or word superfluous."). Under that second alternative in § 11-

9

861(C)(1), a county may adopt the building code of "the largest city in that county" without regard to whether that code has been "promulgated by a national organization or association." In finding that the word "code" carries a similar meaning within the statutes enabling counties and cities to regulate construction, we do not suggest that the legislature gave all of the same options to both political subdivisions. A city is authorized to adopt any building code "prepared by a technical trade association." § 9-801(1). A county, on the other hand, may adopt codes promulgated only by a "national organization or association that is organized and conducted for the purpose of developing codes." § 11-861(A) and (C)(1). Thus, the legislature authorized cities to adopt construction regulations published by a significantly broader range of sources, including local and parochial technical associations. Because a city building code might therefore contain components that could not be adopted by a county through its own independent authority, a county could not pursue a policy of uniformity within incorporated and unincorporated portions of its boundaries without receiving special legislative authority to mimic the code of its largest city.

¶16 In contrast to the Washburns' suggestion that we should view the "largest city" clause from § 11-861(C)(1) as an implied limitation on the definition of the word "code," the clause shows that when the legislature has intended to constrain a county's authority to adopt building codes, it has been able to articulate the nuances of such limitations. The clause requires a county that has adopted its building code from the "largest city" in the county to also adopt any subsequent building code changes the city enacts. The legislature has also limited a county's ability to adopt fire codes by mandating that such codes must be at least as stringent as the fire

code adopted by the state fire safety committee. *See* § 11-861(C)(2); A.R.S. § 41-2146.[1] Given the willingness of the legislature to lucidly articulate specific limitations on county authority in the context of adopting building requirements, we will not infer from its *silence* an intent to limit counties to the most narrow and hypertechnical definition of the term "code."

**¶17** The Washburns also asserted in oral argument before this court that the legislature's use of the word "limited" in § 11-861(C) conveys its intent to narrow the definition of the word "code" used in the sentence thereafter. Viewed in context, the obvious thrust of that provision confines counties to the use of building standards "promulgated by any national organization or association that is organized and conducted for the purpose of developing codes."[2] In short, § 11-861(C) limits counties' choice of building regulations to those that have been developed by knowledgeable professionals—but does not limit the definition of the word "code." To the contrary, § 11-861(C)(1) explicitly authorizes a county to adopt "*[a]ny* building, electrical or mechanical code" which has the appropriate professional pedigree. (Emphasis added.) Thus, the Washburns' assertion that § 11-861(C) impliedly instructs us to construe the word "code" as a highly technical term of art—rather than by its common usage—finds little support in the language of the statute itself.

---

[1] The underlying policy of these provisions—promoting a minimum measure of uniformity between adjacent jurisdictions—is inapplicable here.

[2] The Washburns do not dispute that ANSI is a "national organization or association" organized for the purpose of developing and promulgating regulations for the construction of homes. Thus, they do not challenge the professional pedigree of ANSI in this regard. Rather, they argue that ANSI promulgates "standards" rather than codes. Their challenge to ANSI as a qualified organization under § 11-861(A) and (C)(1) thus depends on a broader question we address here—whether the legislature intended the word "code" to include comprehensive sets of standards such as those promulgated by ANSI.

11

¶18　　　　　The Washburns also assert that, because § 11-861 requires counties to adopt building "codes" promulgated by nationally recognized organizations, we should interpret the term consistently with the term's meaning within the construction industry. However, we attribute no specialized meaning to statutory language unless the legislature has clearly conveyed its intent that we do so. *Kilpatrick v. Superior Court*, 105 Ariz. 413, 421, 466 P.2d 18, 26 (1970) ("Words are to be given their usual and commonly understood meaning unless it is plain or clear that a different meaning was intended."); *see also* A.R.S. § 1-213 ("Words and phrases shall be construed according to the common and approved use of the language."). Thus, the focus of our inquiry is not whether the terms "code" and "standard" have acquired an industry-specific meaning but whether the legislature intended the term "code" within § 11-861(C)(1) to convey an industry-specific meaning. Because there is nothing in the statutory history or the statute's language in § 11-861(C)(1) suggesting the legislature intended to imbue the terms "code" and "standards" with mutually exclusive, industry-specific definitions the Washburns proffer, we cannot agree with the Washburns' suggestion. If the legislature had intended to use the word "code" as an industry-specific term of art so as to substantially limit the options of county governments in their choice of nationally promulgated building specifications, it would have articulated that intention. Certainly, the legislature could not have expected counties to divine such an intent from a mere use of the word "code" in the statute.

¶19　　　　　Nor do we find any caveat in the ANSI standards themselves indicating they could not constitute a "code" within the meaning of § 11-861(C)(1). The foreword to the ANSI standards provides in part that the standards, "when adopted as a part of a building code, would be compatible with the building code and its enforcement." According to the Washburns, this

12

language demonstrates that the ANSI standards were not intended to stand by themselves as a "code." But the Washburns' argument presupposes that a county could never amend or augment its current building code in a minor fashion without adopting a new comprehensive building code. We find nothing in § 11-861(C)(1) that prevents the county from amending or augmenting its comprehensive building regulations with self-contained "codes," promulgated by appropriate national organizations, that address discrete components of home construction. Moreover, the above-quoted foreword to the ANSI standards demonstrates ANSI's expectation that the standards would have an equal status to other parts of a pre-existing building code once adopted.

¶20            We are also not persuaded to reach a contrary result merely because initially the ANSI standards were not applicable to single-family homes. *See* ANSI standards § 101 ("These criteria are intended to be consistent with the intent of only the technical requirements of the Federal Fair Housing Act Accessibility Guidelines."); 42 U.S.C. § 3603(b)(1) (Fair Housing Act does not apply to most single-family homes). Notwithstanding the original application of the ANSI standards, those standards include a provision that suggests ANSI drafted the standards to be capable of flexible application to different types of "dwelling units" in various settings. Furthermore, the foreword demonstrates that ANSI anticipated the need to be compatible with other types of building codes and drafted the standards with this in mind. Indeed, the very use of the term "standard" connotes compatibility with complementary regulations. We address the Washburns' other claims regarding the county's application of the ANSI standards to single-family homes in the context of their challenges to the ordinance's constitutionality.

¶21            We also find no policy-based explanation for why the legislature would have intended to limit the breadth of the word "code" as used in § 11-861(C)(1). Without question,

13

counties are generally empowered to regulate the construction of homes consistent with specifications suggested by appropriate national bodies. A county's ability to do so depends upon its power to mandate the incorporation of particular design elements. The Washburns do not dispute that counties may enact guidelines regulating the construction of new homes.[3] Although they strenuously argue that a county may only adopt a set of requirements labeled as a "code" but not a set of requirements labeled as "standards," they point to no procedural differences or differences in professional or scientific scrutiny between the manner in which ANSI promulgated the standards adopted here and the manner in which, for example, the ICC promulgates the International Building Code. Both publications define minimum design criteria to implement public policy goals in the building of structures; both anticipate that local governmental authorities will tailor the criteria to promote regionally prioritized public policy; and, once adopted, both contain mandatory language for how the construction must occur. Thus, we are given no plausible explanation as to why the legislature would have intended to make the hypertechnical distinction that the Washburns now urge in challenging the county's authority to adopt the ANSI standards as a code. To accept the Washburns' construction of § 11-861(C) would require us to exalt form over substance. For the foregoing reasons, we find that the county has not exceeded its statutory authority in adopting the ANSI standards here because those collected standards constitute an example of "[a]ny building . . . code that has been promulgated by any national organization . . . that is organized for the purpose of developing codes." § 11-861(C)(1).

---

[3]During oral argument, the Washburns presented us with an example of a "code" that, in their view, a county would be authorized to adopt, "the 2000 International Residential Code."

14

¶22            In a related argument, the Washburns also assert the county lacked the authority to adopt only portions of the ANSI standards.  But they cite no authority for this proposition, and we defer to the determination of the Board of Supervisor that the community's interests were advanced by adopting only specific portions of the ANSI standards.  *See Ariz. Fence Contractors Ass'n v. City of Phoenix*, 7 Ariz. App. 129, 130-31, 436 P.2d 641, 642-43 (1968) (building codes valid exercises of municipality's police power).  Moreover, the ANSI standards themselves contemplate, through a so-called scoping provision, the need for governmental authorities to adapt those standards to the specific needs of their communities.  Accordingly, a governmental authority that enacts a tailored version of the ANSI standards operates in conformity with the intentions of the professional organization that promulgated the standards.  In so doing, the county complies with the requirement of § 11-861(C)(1) that building regulations be consistent with standards set forth by a qualified "national organization."  We therefore determine that § 11-861(C)(1) enables counties to adopt individual building design criterion "promulgated by any national organization or association that is organized and conducted for the purpose of developing codes" that the county determines advances the general health, safety, and welfare of its residents.

### Constitutional Claims

¶23            As they did below, the Washburns next claim the ordinance violates a homeowner's right to privacy in his or her home under the Privacy Clause, article II, § 8 of the Arizona Constitution.  Although they concede that the government possesses the right to adopt building, fire, and mechanical codes that provide for the protection of the general population, they question whether the county can constitutionally impose costly design requirements on all new private homeowners "that have value to less than 1% of the population."  They further assert the

15

ordinance "deprives new homeowners and builders of the fundamental right to design private homes . . . by imposing design criteria that invade the exercise of personal, private, and aesthetic choices for personal private living spaces."

¶24 Homeowners do not have "a right to be completely free from governmental regulation of the use and occupancy of [their] real property." *State v. Watson*, 198 Ariz. 48, ¶9, 6 P.3d 752, ¶9 (App. 2000). Our courts have already determined that building codes that affect the exercise of homeowners' "personal, private, and aesthetic choices" are a proper exercise of police power. *Id.* at ¶14. Accordingly, we agree with the trial court that the ordinance does not unconstitutionally infringe on a homeowner's right to privacy.

¶25 In a related argument, the Washburns contend the ordinance violates their rights under Arizona's Equal Protection Clause, article II, § 13 of the Arizona Constitution, because it burdens only those people constructing new homes. The level of scrutiny we apply to a discriminatory law depends upon whether that law affects a fundamental right or a suspect class or enacts a gender-based classification. *Simat Corp. v. Ariz. Health Care Cost Containment Sys.*, 203 Ariz. 454, ¶15, 56 P.3d 28, ¶15 (2002). Other than pointing to their fundamental right to privacy, the Washburns point to nothing that would subject the ordinance to heightened scrutiny. Because we have already found that the ordinance does not unconstitutionally affect the right to privacy, and because the county has not engaged in any suspect classification in burdening builders of new homes, we uphold the ordinance "so long as there is a legitimate state interest to be served and the legislative classification rationally furthers that interest." *Id.* The Washburns bear the burden of establishing the unconstitutionality of the ordinance. *See Empress Adult Video and Bookstore v. City of Tucson*, 204 Ariz. 50, ¶2, 59 P.3d 814, ¶2 (App. 2002).

16

¶26    To the extent the Washburns argue the Board of Supervisors had no rational basis for concluding that private home designs should facilitate access to people confined to wheelchairs, we disagree. "[I]f the court can hypothesize any rational reason why the legislative body made the choice it did, the statute or ordinance is constitutionally valid. This test validates statutes even if the legislative body did not consider the reasons articulated by the court." *Haines v. City of Phoenix*, 151 Ariz. 286, 290, 727 P.2d 339, 343 (App. 1986). While reasonable minds might differ over whether government should impose these types of design criteria on those building new homes, the propriety of that public policy decision must be made through the political process by duly elected officials.

¶27    The uncontested evidence established that approximately one percent of the population is confined to wheelchairs, but the county points out that a much larger percentage will suffer a disability at some point in their lives. Although all age groups are affected by disability, the county introduced evidence that approximately forty-one percent of people over the age of sixty-five have some form of disability. Disability is a growing problem both nationally and locally, and the county also introduced evidence that Arizona's population of people over the age of sixty is expected to triple by 2025. Although many of these disabled people will not be confined to wheelchairs, the county concluded from these figures that the number of people confined to wheelchairs is rising. For these reasons, the county addressed a legitimate governmental interest when it adopted a building code designed to increase the number of homes accessible to those in wheelchairs. *Cf. Arizona Fence Contractors Ass'n*, 7 Ariz. App. at 131-32, 436 P.2d at 642-43 (adopting building code valid exercise of municipality's police power).

¶28 The Washburns also argue that the ordinance is not rationally related to further the county's interests. Again, we disagree. "A perfect fit is not required; a statute that has a rational basis will not be overturned 'merely because it is not made with "mathematical nicety, or because in practice it results in some inequality."'" *Big D Constr. Corp. v. Court of Appeals*, 163 Ariz. 560, 566, 789 P.2d 1061, 1067 (1990), *quoting Bryant v. Continental Conveyor & Equip. Co.*, 156 Ariz. 193, 197, 751 P.2d 509, 513 (1988), *quoting Uhlmann v. Wren*, 97 Ariz. 366, 388, 401 P.2d 113, 128 (1965); *see also Standhardt v. Superior Court*, ___ Ariz. ___, ¶35, 77 P.3d 451, ¶35 (App. 2003). Although it is true that not all of the people affected by disabilities will benefit from the wheelchair access provisions of the ordinance and, although those conducting renovations of existing homes are not required to comply with the ordinance, a regulation may rationally advance a governmental interest despite the fact that it is underinclusive. *See Bowen v. Owens*, 476 U.S. 340, 348, 106 S. Ct. 1881, 1886, 90 L. Ed. 2d 316, 324 (1986).

¶29 The Washburns lastly contend the ordinance does not rationally advance the county's interests because it places the financial design burdens on homeowners who will probably never be confined to wheelchairs. But the county submitted to the trial court the results of a study suggesting that complying with the ordinance would cost only about $100. In addition, § 103.1 of the ordinance provides that the county may waive any design requirement if a building official determines that the cost of complying with the requirement exceeds $200. Indeed, the Board of Supervisors found that the cost of including the ordinance's designs into a new home was substantially less than the cost of renovating a home to accommodate a person confined to a wheelchair. On this record, the Board of Supervisors could have rationally concluded that the benefit to the community in providing for the disabled justified the comparatively minimal cost of

18

implementing the required design features. Although the Washburns now contest the accuracy of the county's assertions as to the costs of these renovations, they failed in the trial court to introduce controverting evidence regarding the cost of compliance. *See* Ariz. R. Civ. P. 56(e), 16 A.R.S., Pt. 2. The Washburns, therefore, have failed to establish that there were genuine issues of material fact precluding summary judgment. *See Orme Sch.*, 166 Ariz. at 309, 802 P.2d at 1008. Because the ordinance rationally advances a legitimate governmental interest, the trial court did not err in concluding that the ordinance does not violate Arizona's Equal Protection Clause.

¶30        Affirmed.

_____
                                PETER J. ECKERSTROM, Judge

CONCURRING:


_____
PHILIP G. ESPINOSA, Chief Judge



_____
JOHN PELANDER, Presiding Judge