247 P.3d 180

Charles LEFLET; Carlos Bustamonte; and Cynthia Sampley, on behalf of themselves and all others similarly situated, Plaintiffs/Appellants,

v.

REDWOOD FIRE AND CASUALTY IN-SURANCE COMPANY; West American Insurance Company; The Ohio Casualty Insurance Company; American Fire & Casualty Insurance Company; Auto–Owners Insurance Company; Transportation Insurance Company and Trans-continental Insurance Company, Defendants/Appellees.

No. 1 CA–CV 09–0663.

Court of Appeals of Arizona, Division 1, Department E.

Jan. 20, 2011.

Duke Gerstel Shearer, LLP by Andrew F. Lloyd and Alan R. Johnston (Admitted Pro Hac Vice), San Diego, CA, Attorneys for Plaintiffs/Appellants.

Meagher & Geer, P.L.L.P. by Thomas H. Crouch, Kurt M. Zitzer and John C. Hendricks, Scottsdale, Attorneys for Defendants/Appellees Transportation Insurance Company and Transcontinental Insurance Company.

Graif Barrett & Matura, P.C. by Kevin Barrett and Jay R. Graif, Phoenix, Attorneys for Defendant/Appellee Auto–Owners Insurance Company and Redwood Fire and Casualty Insurance Company.

The Cavanagh Law Firm, P.A. by Scott A. Salmon, Cassandra V. Meyer, and Taylor C. Young, Phoenix, Attorneys for Defendants/Appellees West American Insurance Company, Ohio Casualty Insurance Company, and American Fire & Casualty Insurance Company.

SWANN, Judge.

¶ 1 In this construction defect class action, the Plaintiff homeowners entered into a settlement agreement with the Defendant developer, Hancock Communities, LLC, and HC Builders, Inc., (collectively, "Hancock") and two of Hancock's insurers: Commercial Underwriters Insurance Company ("CUIC") and Clarendon America Insurance Company ("Clarendon") (collectively, the "Direct Insurers"). Invoking *United Services Automobile Ass'n v. Morris*, 154 Ariz. 113, 121, 741 P.2d 246, 254 (1987), the developer and its insurers stipulated to an $8.475 million judgment against them and assigned to Plaintiffs their claims against various subcontractors and their insurers ("Non–Participating Insurers" or "NPIs"). The NPIs challenged the agreement and the trial court granted them summary judgment, ruling that the settlement agreement amounted to a breach of Hancock's contractual duty of cooperation with the NPIs.

¶ 2 We are presented with an issue of first impression: whether an insured and an insurer can join in a *Morris* agreement that avoids the primary insurer's obligation to pay

policy limits and passes liability in excess of those limits on to other insurers. We hold that such agreements are invalid, and therefore affirm the trial court's grant of summary judgment in favor of the NPIs. For reasons discussed below, we vacate the award of attorney's fees against the homeowners.

## FACTS AND PROCEDURAL HISTORY[1]

¶3 Hancock built and marketed homes in "Trailwood," a residential development of over 400 single-family homes, between 1997 and 2000. In May 2000, Plaintiffs sued Hancock for breach of contract and breach of implied warranties to recover for construction defects found in the homes. Plaintiffs sought class-action status and the class was certified on December 20, 2001.

¶4 Hancock filed an Answer and Third–Party Complaint. The Amended Third–Party Complaint named as third-party defendants several subcontractors involved in building Trailwood, and asserted claims for breach of contract, breach of warranty, negligence and indemnity.[2]

¶5 Hancock and the Subcontractors each tendered their defenses to their respective insurers, all but one of which accepted the tenders under a reservation of rights.[3] In addition to its own Direct Insurers, Hancock also tendered its defense to the Subcontractors' insurers (the NPIs in the settlement and appellees here), who were obliged under their policies to provide primary coverage to Hancock for claims arising from the scope of the Subcontractors' work. Under the terms of the policies, the Direct Insurers furnished primary coverage to Hancock for its own liability and excess coverage for liability attributed to the Subcontractors. The Subcontractors' insurers accepted Hancock's tender under reservations of rights. Hancock's Direct Insurers remained liable for any claims

that did not fall within the scope of the coverage provided by the NPIs.

¶6 After substantial discovery, the court ordered the parties to mediation. The mediation did not produce a settlement—Plaintiffs demanded $5 million, and the defending parties collectively offered only $807,000. During mediation, Hancock's counsel began discussing a *Morris* agreement in an attempt to convince the NPIs to contribute more to a settlement offer. In parallel negotiations, the insurers were unable to agree on how they would share the costs of Hancock's defense.

¶7. On October 7, 2004, Plaintiffs' counsel and counsel for Hancock appeared in court and entered a settlement agreement into the record. Under the agreement, Hancock agreed to pay Plaintiffs $375,000, to assign to the Plaintiffs its rights against the Subcontractors and their insurers in "a *Damron/Morris* type agreement," and to stipulate to a judgment in favor of Plaintiffs for an amount to be determined later. In exchange, Plaintiffs agreed not to execute the judgment against Hancock or the Direct Insurers who were participating in the agreement. The rights Hancock and the Direct Insurers were to assign included their contribution rights from the NPIs for Hancock's unpaid attorney's fees and expenses, Hancock's rights to pursue bad faith claims against the NPIs, rights against the NPIs to which Hancock had tendered its defense, and any "contractual or otherwise recognized by law indemnification rights" they had against the Subcontractors, the NPIs, or any other insurer of the Subcontractors.

¶8 The court accepted the agreement as binding between the parties pursuant to Ariz. R. Civ. P. ("Rule") 80(d). The Subcontractors and NPIs had no knowledge of the agreement before it was entered into the

1. On an appeal from summary judgment, "[w]e view the facts and any reasonable inferences drawn from those facts in the light most favorable to the party against whom judgment was entered." *Penn–Am. Ins. Co. v. Sanchez*, 220 Ariz. 7, 11, ¶23, 202 P.3d 472, 476 (App.2008).

2. Several subcontractors were subsequently dismissed from the action because they had no colorable connection with the alleged defects.

Those remaining (Agape, Metric, Swiss, and Sun Master) are collectively referred to in this opinion as the "Subcontractors."

3. North American Risk Services ("NARS"), on behalf of Clarendon, initially defended Hancock without reservation. NARS later reserved its rights (including its right to withdraw from Hancock's defense), but continued to fund Hancock's defense.

record. The amount that Hancock and the Direct Insurers agreed to pay in exchange for the agreement not to execute against them was well below their policy limits—CUIC's policy limit alone was $1,000,000 "per occurrence."

¶ 9 On January 14, 2005, the parties to the agreement presented the final written version to the court. In it, Hancock and the Direct Insurers stipulated to a judgment in favor of Plaintiffs for $8.475 million. Plaintiffs agreed to limit their claims against the Subcontractors to indemnification claims for both the $375,000 paid by Hancock and for Hancock's costs and attorney's fees incurred defending the action. The Court approved the class action settlement in April 2005. The Subcontractors settled those claims with Plaintiffs in early November 2005.

¶ 10 In February 2006, shortly after Plaintiffs moved for a determination of the reasonableness of the stipulated judgment, the NPIs intervened. In June 2008, the NPIs sought summary judgment on the ground that Hancock had not provided the notice required under *Morris* and had therefore breached the cooperation clause of the applicable insurance policies. The NPIs also argued that the agreement did not qualify as a *Morris* agreement.

¶ 11 On August 15, 2008, the court granted summary judgment in favor of the NPIs, holding that the October 7, 2004 agreement entered on the record was a binding *Morris* agreement, but finding that the NPIs were prejudiced by Hancock's failure to provide the NPIs with notice and an opportunity to withdraw their reservations of rights. The court therefore concluded that the agreement was a breach of the cooperation clause. The court entered judgment in favor of the NPIs, excusing them from having to defend and indemnify, and awarding them $388,541.35 in attorney's fees and taxable costs to be paid "jointly and severally" by the Plaintiff homeowners. Plaintiffs timely appeal.

## DISCUSSION

■ ¶ 12 The trial court granted summary judgment on the ground that Hancock was in breach of contract for failure to provide proper notice of the impending *Morris* agreement. We agree that Plaintiffs, Hancock and the Direct Insurers did not provide the NPIs the notice required under *Morris*. However, we may also "affirm a trial court on any basis supported by the record," *Solimeno v. Yonan*, 224 Ariz. 74, 82, 227 P.3d 481, 489 (App.2010) (citing *State v. Robinson*, 153 Ariz. 191, 199, 735 P.2d 801, 809 (1987)), and there is an independent and more fundamental basis on which to do so: the agreement falls outside the bounds of *Morris*.[4]

### I. THE SETTLEMENT AGREEMENT IS NOT A COMPLIANT MORRIS AGREEMENT AND PROVIDES NO BASIS FOR CLAIMS AGAINST THE NPIs.

¶ 13 In *Morris*, our supreme court held that an insurer who defends under a reservation of rights may be subject to liability for the amount of a stipulated judgment between the plaintiff and its insured. Reasoning that the insured has a cognizable interest adverse to that of the insurer in avoiding "the sharp thrust of personal liability," the court held that the insured may enter into a settlement with a claimant without breaching the cooperation clause of the policy. *Morris*, 154 Ariz. at 118–19, 741 P.2d at 251–52. By simultaneously assigning its right to sue the insurer for bad faith, the insured can potentially bind the insurer to a stipulated judgment in excess of policy limits, and extract from the claimant a covenant not to execute.

¶ 14 The court recognized the dangers of this settlement mechanism—the insured has little incentive to minimize the amount of the judgment, and the ability of the insured to subject an insurer to tort damages in excess of the policy limits creates the opportunity for collusive settlements that bear little relation to the merits of the underlying case. To avoid such evils, *Morris* requires the insured to provide notice to the insurer, demonstrate that the settlement was free from fraud and collusion, and prove that the settlement amount is reasonable. 154 Ariz. at 119–20, 741 P.2d at 252–53.

---

**4.** We reach both issues to avoid confusion in any future proceedings in this case.

¶ 15 The overarching goal of *Morris* is to permit the insured and the insurer to balance their competing interests in an atmosphere of fairness and defined risk—not to promote the transformation of underlying contract and tort claims into bad faith claims at inflated values. *Morris* likewise does not penalize insurers for properly reserving the right to contest coverage—even under a valid *Morris* agreement, an insurer may defend on the ground that the loss was not covered. 154 Ariz. at 119–20, 741 P.2d at 252–53.

¶ 16 Underscoring the point that *Morris* agreements can exist only within the confines of the doctrine that created them, the supreme court has observed: "Plaintiff's counsel ... have every incentive to avoid creating [*Morris*] agreements outside the permitted parameters. If counsel negotiate such agreements, the result will be that their clients can collect neither from the defendant ... nor from the insurer." *Safeway Ins. Co. v. Guerrero*, 210 Ariz. 5, 15, 106 P.3d 1020, 1030 (2005) (internal citation and quotation marks omitted). The dispositive question in this case is whether the settlement falls "outside the permitted parameters" of *Morris*. We conclude that it does.

¶ 17 The settlement in this case is unusual because it involves multiple layers of insurance, and an insurer was a party to the agreement. The Direct Insurers, who participated in the settlement, paid less than their policy limits despite the fact that the stipulated judgment exceeded their contribution by more than twentyfold. The clear intent and effect of the agreement was to favor the Direct Insurers and burden the NPIs. Unlike the insured in *Morris*, Hancock did not act simply to protect itself from an insurer's refusal to extend unconditional coverage. Instead, it acted as an agent of an insurer that sought to limit its own liability. As parties to the agreement, the Direct Insurers' interests were aligned with—not opposed to—those of their insured.

¶ 18 Complicating matters further is the fact that unlike *Morris*, which involved a single insurer and a single occurrence, this case involved separate coverages from the various NPIs that were limited by their terms to the scope of the various Subcontrac-

tors' work. Though the NPIs may have reserved their rights more broadly than was necessary or appropriate, there is no doubt that they had legitimate interests in ensuring that their liability was confined to the scope of work covered by their policies. And because there had yet been no determination which of the various Subcontractors' work contributed to Plaintiffs' damages (much less the value of any Subcontractor's liability), no NPI could properly be expected to extend coverage for Hancock's entire liability.

¶ 19 Unlike an insured defendant, a primary insurer who acts in good faith is subject to liability only to the extent of its policy limits, a risk for which it bargained and was paid. A primary insurer faces neither of the insured's risks that gave rise to the *Morris* doctrine: the prospect of an excess judgment or a judgment within policy limits for which it may not receive coverage. *Morris*, 154 Ariz. at 118, 741 P.2d at 252. It is therefore not surprising that there is no precedent for a *Morris* agreement that operates in favor of an insurer by shrinking its liability to less than policy limits, and the public policy underlying *Morris* does not justify such a creature. We therefore hold that an insurer that reserves its rights may not employ *Morris* to reduce its liability below policy limits, and an insured that facilitates such an effort breaches its duty to cooperate with its other insurers.

¶ 20 Here, Hancock's Direct Insurers neither paid policy limits toward their primary liability, nor was a primary liability less than policy limits adjudicated or agreed to. And though the NPIs may well have been liable for significant amounts under their policies, Hancock could not properly join with one insurer to burden others without first making the terms of the settlement available to all. Faced with a choice to pay $375,000 or be subject to an $8.475 million *Morris* agreement, the NPIs may well have elected the former. But that, of course, would have defeated the purpose of the agreement from Plaintiffs' point of view and it is unlikely that an agreement would ever have emerged at such a low amount. The preferential treatment that the Direct Insurers received was therefore at the heart of the agreement—the

effect was to reduce dramatically the total insurance available to pay Plaintiffs and thereby impose a greater proportional risk on the NPIs.

¶ 21 Appellants attempt to avoid the doctrinal underpinnings of *Morris* by arguing that "the cooperation clause did not prohibit Hancock from assigning its rights to anyone, including Appellants." This narrow reading of the cooperation clause ignores the fact that Hancock did not merely assign its rights—it assigned its rights after stipulating to an $8.475 million judgment that neither it nor its Direct Insurers could ever be liable to pay. Neither *Morris* nor any other case defines such conduct as actual "cooperation"—rather, *Morris* simply defines limited circumstances in which an insured is relieved of its duty to cooperate. Because *Morris* agreements are fraught with risk of abuse, a settlement that mimics *Morris* in form but does not find support in the legal and economic realities that gave rise to that decision is both unenforceable and offensive to the policy's cooperation clause.[5]

## II. EVEN IF THE AGREEMENT HAD QUALIFIED UNDER MORRIS, PLAINTIFFS DID NOT PROVIDE THE REQUIRED NOTICE TO THE NPIs.

■ ¶ 22 The agreement between Plaintiffs, Hancock and the Direct Insurers was complete as to all material terms between the parties when it was dictated into the record, per Rule 80(d), on October 7, 2004. The only unsettled term was one which concerned neither Hancock nor the Direct Insurers, and which was left to Plaintiffs' complete discretion: the amount of the judgment to be entered, for which Hancock and the Direct Insurers would have no liability. "It is elementary that for an enforceable contract to exist there must be an offer, an acceptance, consideration, and *sufficient specification of terms so that the obligations involved can be ascertained.*" *Regal Homes, Inc. v. CNA Ins.*, 217 Ariz. 159, 166, ¶ 29, 171 P.3d 610, 617 (App.2007) (quoting *Savoca*

*Masonry Co. v. Homes & Son Constr. Co.*, 112 Ariz. 392, 394, 542 P.2d 817, 819 (1975)). The October 7, 2004 agreement defined the participating parties' obligations to each other and was accepted by the court as binding pursuant to Rule 80(d).

■ ¶ 23 Had that agreement been a true *Morris* agreement, then each NPI would be "bound by the settlement ... *if, but only if,* [each] was given notice and opportunity to defend." *Morris*, 154 Ariz. at 120, 741 P.2d at 253 (emphasis added). "To protect the insurer ... a *Morris* agreement must be preceded by appropriate notice to the insurer." *Parking Concepts, Inc. v. Tenney*, 207 Ariz. 19, 22, ¶ 13, 83 P.3d 19, 22 (2004). Because an insurer who defends under a reservation of rights is always aware of the possibility of a *Morris* agreement, the mere threat of *Morris* in the course of settlement negotiations does not constitute sufficient notice. Instead, the insurer must be made aware that it may waive its reservation of rights and provide an unqualified defense, or defend solely on coverage and reasonableness grounds against the judgment resulting from the *Morris* agreement. The NPIs were not given the protections of this choice before the agreement was entered, and therefore can face no liability for the resulting stipulated judgment.

## III. THE TRIAL COURT ABUSED ITS DISCRETION IN AWARDING ATTORNEY'S FEES UNDER A.R.S. § 12–341.

¶ 24 In insurance litigation,

[e]ven when the bad faith action is not groundless, the losing party faces the potential of a fee award under A.R.S. § 12–341.01. *See Sparks v. Republic Nat'l Life Ins. Co.*, 132 Ariz. 529, 544, 647 P.2d 1127, 1142 (1982) (concluding that an action alleging insurance bad faith is one "arising out of contract" within the meaning of § 12–341.01(A)).

*Safeway*, 210 Ariz. at 15, 106 P.3d at 1030. Here, the NPIs sought attorney's fees incurred from the time Plaintiffs moved for a

---

5. In *Morris,* the court noted: "[f]rom a public policy standpoint, the result of such agreements is both unpredictable and often unfair to one side or the other." 154 Ariz. at 119, 741 P.2d at 252. To guard against these risks, the court imposed the limits on their use that we apply in this case.

reasonableness hearing on the purported *Morris* agreement. The NPIs provided complete and detailed documentation of the fees and costs incurred.

¶ 25 Plaintiffs argue that there is no precedent for an award of attorney's fees against a class-action plaintiff. "[I]nterpretation and application of the attorney fee statute present questions of law subject to *de novo* review." *Ariz. Tile, L.L.C. v. Berger,* 223 Ariz. 491, 498–99, ¶ 35, 224 P.3d 988, 995–96 (App.2010). "In interpreting statutes, our central goal 'is to ascertain and give effect to the legislature's intent.'" *Yarbrough v. Montoya–Paez,* 214 Ariz. 1, 5, ¶ 12, 147 P.3d 755, 759 (App.2006) (quoting *Washburn v. Pima County,* 206 Ariz. 571, 575, ¶ 9, 81 P.3d 1030, 1034 (App.2003)). "To determine legislative intent, we look first to the language the legislature has used as providing 'the most reliable evidence of its intent.'" *Id.* at 5, 147 P.3d at 759 (quoting *Walker v. City of Scottsdale,* 163 Ariz. 206, 209, 786 P.2d 1057, 1060 (App.1989)).

¶ 26 The plain language of A.R.S. § 12–341.01(A) applies the statute to "any contested action arising out of contract." This class action was a "contested action." We see no basis upon which to create a wholesale exemption for class plaintiffs when the Legislature has not seen fit to do so, and instead decide this case on narrower grounds.

¶ 27 Though we cannot say that class plaintiffs are exempt as a matter of law from the reach of § 12–341.01(A), special considerations nonetheless apply to such awards. In particular, we note that the involvement of class members in the tactical management of litigation is usually more attenuated than that of traditional named parties. In enacting § 12–341.01(A), "[t]he legislature intended ... [to] encourage more careful analysis prior to filing suit." *Chaurasia v. Gen. Motors Corp.,* 212 Ariz. 18, 29, ¶ 43, 126 P.3d 165, 176 (App.2006). But nothing in the superior court's decision or our opinion today reaches the viability of the claims against Hancock that the class members decided to pursue. This appeal concerns only a single collateral issue—the soundness of a novel attempt at settlement.

¶ 28 The unsuccessful attempt to create a new variant of *Morris* agreement was not the informed decision of the class members. Indeed, the notice to the class members concerning the settlement described a typical *Morris* agreement, and contained no reference to the novel components that render the settlement ineffective in this case. Even if we were to hold the class members to the greatest possible level of diligence and intuition, we could not expect them to understand that they were embarking on a legally unsound course when the litigation over the validity of the settlement began.

¶ 29 In this case, the NPIs prevailed in their attack on the settlement. But the litigation did not test the merits of their coverage defenses or the reasonableness of the settlement amount. And Plaintiffs never sued the NPIs, either in their own right or as the assignees of Hancock. Rather, the NPIs intervened to test the conceptual validity of the settlement agreement (to which they were not parties) before such an action could commence. In these circumstances, though it might be appropriate to offset a fee award against some future recovery by the Plaintiff class, the purposes of A.R.S. § 12–341.01 would not be served by an award of fees against them jointly and severally. We therefore conclude that the trial court abused its discretion in awarding fees against Plaintiffs "jointly and severally."

*CONCLUSION*

¶ 30 For the reasons stated, we affirm the judgment of the trial court concerning the validity of the settlement agreement as to the NPIs. We vacate and remand the award of attorney's fees. In our discretion, we decline to award the NPIs the attorney's fees they have requested on appeal pursuant to A.R.S. § 12–341.01(A).

PHILIP HALL, Presiding Judge, and SHELDON H. WEISBERG, Judge.