288 P.3d 764

**COLORADO CASUALTY INSURANCE COMPANY, a Colorado corporation, Plaintiff/Appellee,**

v.

**SAFETY CONTROL COMPANY, INC., an Arizona corporation; Employer's Mutual Casualty Company, an insurance company, Defendant/Appellant,**

**Hugo Roman, an individual, Intervenor/Appellee.**

**No. 1 CA–CV 10–0871.**

Court of Appeals of Arizona, Division 1, Department E.

Sept. 11, 2012.

---

Raymond Greer & Sassaman PC By Daniel W. McCarthy, Michael J. Raymond, Phoenix, Attorneys for Defendant/Appellant Safety Control Co., Inc.

Stinson Brown By William G. Stinson, Jr., Glendale, and William H. Douglas, PLLC By William H. Douglas, Scottsdale, Attorneys for Defendant/Appellant Employer's Mutual Casualty Co.

The Rees Law Firm By David W. Rees, Tucson, Attorneys for Plaintiff/Appellee.

Fennemore Craig PC By Julio M. Zapata, John D. Everroad, Alexander R. Arpad, Phoenix, Attorneys for Intervenor/Appellee.

## OPINION

JOHNSEN, Judge.

¶ 1 We address in this case the validity and effect of a *Damron* agreement involving a contractor and its excess insurer by which the contractor assigned to a tort victim the contractor's indemnification rights against its primary insurer.[1] We hold the agreement is enforceable but remand for a determination of whether the stipulated judgment falls within the primary insurer's policy.

## FACTS AND PROCEDURAL HISTORY

¶ 2 The Arizona Department of Transportation ("ADOT") hired DBA Construction Company ("DBA") to perform a road-improvement project on the Loop 101 freeway. Safety Control Company, Inc. was one of DBA's subcontractors. As required by the subcontract, Safety Control purchased from Employer's Mutual Casualty Company ("EMC") a certificate of insurance identifying DBA as an additional insured on a policy providing primary coverage for liability arising out of Safety Control's work. DBA itself had purchased a policy from Colorado Casualty Insurance Company that provided excess coverage for liability arising out of the work of its subcontractors, including Safety Control.

¶ 3 A collision occurred at the construction site, injuring a motorist, Hugo Roman, who sued ADOT and DBA for damages. Colorado Casualty tendered DBA's defense to the subcontractors, including Safety Control. Safety Control and EMC rejected the tender. Roman eventually settled his claims against DBA and ADOT. DBA and ADOT stipulated with Roman for entry of judgment of $750,000; Roman received $75,000 from DBA (paid by Colorado Casualty) and $20,000 from ADOT, and agreed not to execute on the stipulated judgment. DBA, ADOT and Colorado Casualty assigned to Roman their rights against the subcontractors and other insurers.

¶ 4 Colorado Casualty then filed suit against three subcontractors and their insurance carriers—including Safety Control and EMC—to recover what it had paid to defend DBA and ADOT and settle with Roman. Roman in turn moved to intervene and dismiss, arguing Colorado Casualty had assigned its subrogation rights to him as part of the settlement agreement. The superior court did not dismiss the suit, but allowed Roman to intervene. Roman then filed a counterclaim against Colorado Casualty and a cross-claim against the subcontractors.

¶ 5 Roman and Colorado Casualty eventually settled their claims against all but Safety Control and EMC. The superior court ruled on summary judgment that EMC breached a duty to defend DBA and that as a result, "DBA was entitled to settle with Roman without EMC's consent as long as the settlement was not collusive or fraudulent." After more briefing, the court held the stipulated judgment was neither collusive nor procured by fraud and that EMC therefore was liable to Roman on the stipulated judgment and for his attorney's fees. The court also held Safety Control breached its subcontract with DBA by failing to procure completed-operations insurance coverage and would be liable for damages to the extent that EMC did not satisfy what remained (after the other settlements) of the stipulated judgment and awards of attorney's fees.

¶ 6 Safety Control and EMC timely appealed from the judgment. We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution, and Arizona Revised Statutes ("A.R.S.") section 12–2101(A)(1) (2011).

---

1. A *"Damron"* agreement is an agreement between a claimant and an insured in which the insured consents to a judgment and agrees to assign to the claimant the insured's claims against its insurer in exchange for the claimant's covenant not to execute on the stipulated judgment. *See Damron v. Sledge*, 105 Ariz. 151, 460 P.2d 997 (1969); *see also United Servs. Auto Ass'n v. Morris*, 154 Ariz. 113, 741 P.2d 246 (1987).

## DISCUSSION

### A. Standard of Review.

¶ 7 On review of summary judgment, we view all facts and inferences in the light most favorable to the parties against whom judgment was entered. *Case Corp. v. Gehrke*, 208 Ariz. 140, 143, ¶ 10, 91 P.3d 362, 365 (App.2004). "Interpretation of a contract is a question of law that we review *de novo.*" *Grubb & Ellis Mgmt. Servs., Inc. v. 407417 B.C., L.L.C.*, 213 Ariz. 83, 86, ¶ 12, 138 P.3d 1210, 1213 (App.2006).

### B. The Disagreement Between Roman and Colorado Casualty Does Not Preclude Them from Pursuing Their Claims Against EMC and Safety Control.

¶ 8 We first address the contention by Safety Control and EMC that the judgment against them is unenforceable because a dispute remains between Roman and Colorado Casualty about which of them owns some of the claims at issue.

¶ 9 The record discloses that the initial version of a settlement agreement among Roman, DBA, ADOT and Colorado Casualty reserved Colorado Casualty's right to pursue claims against Safety Control and/or EMC for fees and costs it incurred in defending DBA and ADOT against Roman's complaint. But the final version of the settlement agreement omitted any mention of any such subrogation rights. Colorado Casualty's complaint and Roman's complaint-in-intervention disagree about which of them has the right to pursue the claims for fees and costs.

¶ 10 The superior court's judgment includes $97,011.03 awarded to Colorado Casualty, which we understand to be on its claims for reimbursement of defense fees and costs. As to that amount, however, the judgment provides, "Roman and Colorado Casualty shall resolve their dispute concerning this award amongst themselves." Consistent with that statement, in the summary judgment proceedings in the superior court and on appeal, Roman and Colorado Casualty assert that they have agreed to pursue the assigned claims jointly and to resolve the question of which of them is entitled to the proceeds after the matter is resolved on the merits.

¶ 11 Safety Control and EMC cite Arizona Rule of Civil Procedure 17(a) to support their argument that the superior court should have determined which party owns the claims for fees and costs before entering judgment. That rule states, "Every action shall be prosecuted in the name of the real party in interest." The purpose of this rule "is to enable the defendant to avail himself of the evidence and defenses that he has against the real party in interest and to assure the finality of the results in the application of res judicata." *Cruz v. Lusk Collection Agency*, 119 Ariz. 356, 358, 580 P.2d 1210, 1212 (App.1978).

¶ 12 Under these circumstances, we conclude Rule 17(a) does not preclude the judgment the superior court entered on the claims for recovery of defense fees and costs. Safety Control and EMC do not argue that the agreement between Roman and Colorado Casualty has prevented them from raising any defenses to the claims or that the judgment might allow a double recovery. The judgment only awarded the fees and costs to Colorado Casualty, not to Roman or to both of them, and we fail to see how Safety Control and EMC might be prejudiced.

### C. The Settlement Agreement Is Not Otherwise Invalid.

¶ 13 An insurance policy imposes on the insurer the duty to defend the insured against claims potentially covered by the policy and the duty to indemnify the insured for covered claims. *United Servs. Auto. Ass'n v. Morris*, 154 Ariz. 113, 117, 741 P.2d 246, 250 (1987); *Ariz. Prop. & Cas. Ins. Guar. Fund v. Helme*, 153 Ariz. 129, 137, 735 P.2d 451, 459 (1987). The insured, in turn, must cooperate with the insurer and aid in his defense. *See Helme*, 153 Ariz. at 136, 735 P.2d at 458; *see also Morris*, 154 Ariz. at 117, 741 P.2d at 250.

¶ 14 In *Damron v. Sledge*, 105 Ariz. 151, 460 P.2d 997 (1969), our supreme court held that when an insurer breaches a contract of insurance by failing to defend, the duty of cooperation does not prevent the

insured from entering into a settlement with the claimant and assigning his rights under the policy to the claimant. *Id.* at 153, 460 P.2d at 999; *see Morris,* 154 Ariz. at 119, 741 P.2d at 252 (insured may enter similar agreement if insurer defends but reserves its right to dispute coverage). As long as the stipulated judgment is not fraudulent or collusive, an insurer that has failed to defend is bound by the judgment "with respect to all matters which were litigated or could have been litigated in that action." *State Farm Mut. Auto. Ins. Co. v. Paynter,* 122 Ariz. 198, 200, 593 P.2d 948, 950 (App.1979).[2]

¶ 15 EMC argues DBA's settlement with Roman was collusive because, unlike the insured in a typical *Damron/Morris* situation, DBA was not compelled to settle to avoid "the sharp thrust of personal liability." *See Damron,* 105 Ariz. at 153, 460 P.2d at 999. Given that Colorado Casualty was providing DBA with a defense, EMC argues the impermissible purpose of the agreement was not to protect DBA but to shift liability for the settlement amount from Colorado Casualty to EMC.

¶ 16 We begin our analysis by noting that DBA assigned to Roman only its indemnity claim against EMC; it did not assign a claim for breach of any other duty an insurer owes an insured. *See generally Rawlings v. Apodaca,* 151 Ariz. 149, 159, 726 P.2d 565, 575 (1986). Under these circumstances, we see no reason why the validity of the settlement and assignment should not be governed by "general principles of indemnity law." *A Tumbling–T Ranches v. Flood Control Dist. of Maricopa County,* 220 Ariz. 202, 207, ¶ 11, 204 P.3d 1051, 1056 (App.2008) (citing Restatement (Second) of Judgments § 57(1)(1982)).

¶ 17 In *A Tumbling–T Ranches* we approved a *Damron/Morris* agreement in a purely commercial indemnity setting. 220 Ariz. at 208, ¶ 15, 204 P.3d at 1057 (expressly "reject[ing] the contention that there was no ability to enter into a *Damron/Morris* agreement in a context other than an insurance case"). Having held in *A Tumbling–T Ranches* that parties to a commercial indemnification dispute may enter into a *Damron* agreement, we cannot accept EMC's argument that DBA's settlement with Roman is invalid simply because DBA was enjoying the benefit of a defense provided by Colorado Casualty after EMC declined. As we held in *Paynter,* an insurer that refuses to defend a claim must know that a judgment may be entered against the insured and that it will be liable if the claim is within its policy. 122 Ariz. at 201, 593 P.2d at 951. EMC may not escape the consequences of its decision to decline to defend DBA in this case simply because DBA's other insurer did not make the same decision.

¶ 18 We also cannot accept EMC's further argument that the agreement is an invalid attempt to shift Colorado Casualty's defense and indemnity obligations to EMC, pursuant to *Leflet v. Redwood Fire & Casualty Insurance Co.,* 226 Ariz. 297, 247 P.3d 180 (App. 2011). *Leflet* was a construction-defect case in which homeowners sued a developer. The developer and its insurer eventually stipulated to a judgment that the homeowners agreed to enforce against the developer's subcontractors and their insurers. *Id.* at 299, ¶ 7, 247 P.3d at 182.

¶ 19 We do not agree with EMC that our decision to invalidate the *Morris* agreement in *Leflet* requires us to reject the *Damron* agreement at issue here. Central to our decision in *Leflet* was the notion that the settlement we disapproved effectively transferred to the subcontractors' insurers an indemnity obligation that lay in the first instance with the developer's insurer. *See id.* at 298–99, ¶ 2, 247 P.3d at 181–82. We also emphasized in that case that the agreement assigned the developer's bad-faith rights against the subcontractors' insurers, exposing those insurers to liability in excess of their policy limits. *Id.* at 299, ¶ 7, 247 P.3d at 182. By contrast, the agreement in this case assigned nothing more than an indemnity claim that may be enforced against EMC

---

2. An exception applies to an adjudication involving an issue as to which there is a conflict of interest between the insured and the insurer; in that case, even if the insurer refused to defend, it is not bound by the adjudication. *Farmers Ins. Co. of Ariz. v. Vagnozzi,* 138 Ariz. 443, 448, 675 P.2d 703, 708 (1983) (citing Restatement (Second) of Judgments § 58 (1982)).

only if the stipulated judgment proves to be a liability that is within the scope of the coverage that EMC promised to provide to DBA.[3]

### D. Issues of Fact Remain About Whether the Judgment Falls Within the EMC Policy.

#### 1. Legal principles.

¶ 20 Although we agree with the superior court that the *Damron* agreement that DBA, Colorado Casualty and Roman entered in this case is valid, an agreement under *Damron* or *Morris* does not create coverage "that the insured did not purchase." *Morris*, 154 Ariz. at 120, 741 P.2d at 253. To the contrary, EMC is liable for the stipulated judgment only if the judgment constituted a liability falling within its policy. *Id.; see Paynter*, 122 Ariz. at 200, 593 P.2d at 950.

#### 2. Whether the judgment is a liability that "arises out of" Safety Control's operations.

¶ 21 The EMC policy insured DBA "with respect to liability arising out of [Safety Control's] ongoing operations performed" pursuant to the subcontract. "[A]rising out of" is a "broad, general, and comprehensive term[ ] effecting broad coverage." *Regal Homes, Inc. v. CNA Ins.*, 217 Ariz. 159, 163, ¶ 15, 171 P.3d 610, 614 (App. 2007) (citing *Farmers Ins. Co. v. Till*, 170 Ariz. 429, 430, 825 P.2d 954, 955 (App.1992)). For claimed damages to "arise out of" an event, there must be evidence of a "causal relationship" between the damages and the event, but proximate causation is not required. *Farmers*, 170 Ariz. at 430, 825 P.2d at 955.

¶ 22 In considering whether the stipulated judgment was a liability "arising out of" Safety Control's operations, we first determine whether the judgment has any pre-clusive effects bearing on coverage. Under general principles of indemnity law, if an indemnitor has received "reasonable notice of the action" but declines an opportunity to assume or participate in the defense, absent a conflict of interest it is "estopped from disputing the existence and extent of the indemnitee's liability" if the "indemnitee defended the action with due diligence and reasonable prudence." Restatement (Second) of Judgments ("Restatement") § 57(1) (1982). The result is that the "indemnitor is precluded from relitigating issues determined" in the judgment. *Cunningham v. Goettl Air Conditioning, Inc.*, 194 Ariz. 236, 240, ¶ 19, 980 P.2d 489, 493 (1999) (quoting Restatement § 57(1)). *See also A Tumbling–T Ranches*, 220 Ariz. at 208, ¶ 15, 204 P.3d at 1057 ("We discern no fundamental difference between the obligations imposed under [Restatement] § 57(1) and those set forth in the *Damron/Morris* line of cases.").

¶ 23 There is no dispute that EMC received notice and an opportunity to participate in the case Roman brought against DBA. Nor does EMC raise any real argument that DBA did not defend itself diligently and prudently in that case. Accordingly, EMC is bound for purposes of coverage by any issues determined by the stipulated judgment. *See Associated Aviation Underwriters v. Wood*, 209 Ariz. 137, 150, ¶ 37, 98 P.3d 572, 585 (App.2004) (insurer bound by "legal and factual issues that underlie" stipulated judgment entered pursuant to *Morris* ). Having inspected the stipulated judgment and reviewed the circumstances under which it was entered, however, we cannot say it determined issues that necessarily resolve whether the judgment is a liability that arose out of Safety Control's operations, within the meaning of the EMC policy.

¶ 24 Roman's complaint alleged DBA and ADOT were negligent in configuring, install-

---

**3.** In a motion for reconsideration of our original decision in this appeal, EMC argues the settlement improperly relieved Colorado Casualty of its obligations to defend and indemnify DBA for claims arising out of DBA's work. But Safety Control's subcontract required it to procure primary coverage for DBA for liability arising out of Safety Control's ongoing operations for DBA. And EMC concedes that it provided primary in- surance to DBA for claims arising out of Safety Control's ongoing operations and that Colorado Casualty, by contrast, provided "direct primary insurance to DBA [ ] for everything else." EMC offers no argument based on either policy's "other insurance" clause to support the proposition that Colorado Casualty should have to share the expense of a liability arising from Safety Control's ongoing operations on the project.

ing and maintaining various devices, including pavement markings, temporary traffic barricades and concrete barriers, used to control traffic during the freeway construction project. DBA contracted with Safety Control for the concrete barriers used to help divert traffic around the construction site; other subcontractors were responsible for other traffic control devices, all of which were installed pursuant to a plan that Safety Control argues was not within its scope of work. Against this background, the judgment to which ADOT and DBA stipulated did not specify how the collision occurred or the manner in which any of its subcontractors was negligent in causing Roman's injuries. Indeed, the judgment incorporated by reference the parties' settlement agreement, which expressly provided that neither DBA nor ADOT admitted "liability for any of the claims that have been asserted against them."

¶ 25 In determining the scope of an insurer's duty to defend, whether a claim "arose out of" a party's work "must be determined initially from the allegations in the complaint against [the party] and the facts known at that time." *Regal Homes,* 217 Ariz. at 164, ¶ 19, 171 P.3d at 615. But we deal here with an insurer's duty to indemnify, not with its duty to defend. An insurer's duty to indemnify hinges not on the facts the claimant alleges and hopes to prove but instead on the facts (proven, stipulated or otherwise established) that actually create the insured's liability. *See Lennar Corp. v. Auto–Owners Ins. Co.,* 214 Ariz. 255, 261, ¶ 11, 151 P.3d 538, 544 (App.2007); *Salerno v. Atlantic Mut. Ins. Co.,* 198 Ariz. 54, 58–59, ¶ 17, 6 P.3d 758, 762–63 (App.2000) (court of appeals looked beyond allegations in complaint in determining coverage).

¶ 26 The record contains no finding by the superior court that DBA's liability to Roman under the stipulated judgment arose out of Safety Control's operations, within the mean-

ing of the EMC policy; nor does it appear the parties asked the court to address that issue. Therefore, on remand, the court shall conduct whatever proceedings it deems appropriate to resolve that issue.

### 3. Safety Control's "ongoing operations."

¶ 27 EMC urges us to reverse two rulings the superior court made on summary judgment that on remand will bear on whether the stipulated judgment falls within the policy. First, as stated, the policy insured DBA for liability arising out of Safety Control's "ongoing operations" for DBA. The superior court held Safety Control's operations were ongoing at the time of the collision; on appeal, EMC argues there is no coverage under its policy because Safety Control's "ongoing operations" were completed at the time of the collision.

¶ 28 The policy does not define "ongoing operations," and no Arizona court has construed the phrase. The interpretation of an insurance policy presents a question of law, which we review *de novo. First Am. Title Ins. Co. v. Action Acquisitions, LLC,* 218 Ariz. 394, 397, ¶ 8, 187 P.3d 1107, 1110 (2008). We interpret insurance contracts "according to their plain and ordinary meaning," *Keggi v. Northbrook Prop. & Cas. Ins. Co.,* 199 Ariz. 43, 46, ¶ 11, 13 P.3d 785, 788 (App.2000), and examine the policy's terms from the standpoint of one untrained in law or the insurance business, *Thomas v. Liberty Mut. Ins. Co.,* 173 Ariz. 322, 325, 842 P.2d 1335, 1338 (App.1992).

¶ 29 The phrase "ongoing operations" in this context is not ambiguous. EMC cites *Hartford Insurance Co. v. Ohio Casualty Insurance Co.,* 145 Wash.App. 765, 189 P.3d 195, 202, ¶ 27 (2008), which held that liability arising out of "ongoing operations" means "liability that arises while the work is still in progress."[4] Adopting that

---

4. Courts in other jurisdictions generally agree with this definition. *See Liberty Mut. Fire Ins. Co. v. E.E. Cruz & Co.,* 475 F.Supp.2d 400, 410 (S.D.N.Y.2007) (" 'ongoing operations' encompasses all performance under the Contract that occurs *prior* to the completion of the contracted work"); *Weitz Co., LLC v. Mid–Century Ins. Co.,* 181 P.3d 309, 313 (Colo.App.2007) ("that [which] is going on [or] actually in process" (citations omitted)); *Mikula v. Miller Brewing Co.,* 281 Wis.2d 712, 701 N.W.2d 613, 621 (Wis. App.2005) ("work ... 'that is actually in process,' or that is 'making progress' " (citations omitted)).

definition, we hold the collision that gave rise to the stipulated judgment in this case occurred during Safety Control's "ongoing operations" because it occurred while Safety Control's work under the subcontract was "still in progress."

¶ 30 In its subcontract, Safety Control promised to "furnish and pay for all labor, services, materials, installation, tools, supplies, insurance, and equipment" required to install and maintain concrete barriers on the freeway and the access road to prevent drivers from proceeding into the construction area. Safety Control was paid on a "unit price" basis, and the subcontract separately specified the charges to install and to remove specific quantities of barriers and rent for each day each barrier was in use. The subcontract further provided that Safety Control was responsible for the barriers and required to maintain them "until completion and final acceptance of the entire project" by ADOT.

¶ 31 Under the subcontract and the undisputed facts in the record before the superior court on summary judgment, Safety Control's "ongoing operations" continued from the time Safety Control installed the barriers until the time it removed them. Accordingly, given it was undisputed that the barriers were in place and in use at the time of the collision in which Roman sustained injury, we hold the court correctly concluded on summary judgment that the collision occurred during Safety Control's "ongoing operations," within the meaning of the EMC policy.

#### 4. Work "put to its intended use."

¶ 32 EMC next argues the superior court erred by rejecting its argument on summary judgment that Roman's claim against DBA fell within a policy exclusion for injury that occurs "after ... [t]hat portion of 'your work' out of which the injury arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as part of the same project." EMC argues that Safety Control's work was put to "its intended use" when the

barriers were set in place. Because the collision occurred after barriers were installed, EMC argues, the "intended use" exclusion bars coverage.

¶ 33 On its face, however, the policy exclusion does not apply if Safety Control's work was put to its intended use by another contractor or subcontractor on the project. We agree with the superior court that in this context, Safety Control's barriers were put to their intended use by DBA, which had contracted for installation of the barriers to regulate traffic flow around the construction site until work was completed and ADOT accepted the project. EMC cites no authority for the proposition that in a situation such as this, devices installed to control traffic during a highway construction project are "put to [their] intended use" by the motorists whom the barriers control rather than by the contractor that has installed the barriers to control the motorists. Accordingly, we agree with the superior court that as a matter of law, this policy exclusion did not bar coverage.

#### E. Safety Control Breached the Subcontract by Failing to Procure "Completed Operations" Coverage for DBA.

¶ 34 Roman's only remaining claim against Safety Control is that it breached the subcontract by failing to procure additional insurance coverage for DBA with respect to Safety Control's work on the construction site.[5] As noted, the EMC policy covered liability for Safety Control's "ongoing operations," but the superior court found on summary judgment that Safety Control breached by failing also to procure "completed operations" coverage for DBA. It held Safety Control would be liable for the stipulated judgment if and to the extent that EMC fails to perform under the "ongoing operations" policy.

¶ 35 The subcontract stated that Safety Control must procure a commercial general liability insurance policy for DBA that would cover "all operations" by Safety Control, in-

---

**5.** Roman expressly has disclaimed any direct indemnity claim that DBA may have had against

Safety Control.

cluding "[c]ompleted operations and products liability" and several other specified coverages. The subcontract continued,

> Each of the above required certificates ... shall provide that a provision or endorsement has been made naming [DBA] as additional named insured[ ] as respects liabilities arising out of [DBA's] performance of the work under this Agreement, including products and completed operations liability.... Each of the above required certificates *shall also provide* that an endorsement has been made naming [DBA] as additional named insured as respects to operations performed for [DBA] and shall have attached to it a duly executed additional insured endorsement in a form acceptable to Contractor. (CG2010(3/97)[) ] or equivalent for the general liability.

(Emphasis added.)

 ¶ 36 Safety Control argues the subcontract did not require it to procure "completed operations" insurance for DBA because the policy form referenced by number in the "shall also provide" sentence recited above states that it covers an additional insured "only with respect to liability arising out of [the subcontractor's] ongoing operations performed for that insured." Even if we accept Safety Control's characterization of the industry form, the subcontract's citation to that form did not relieve Safety Control of the obligation to provide the other coverages the subcontract required. The subcontract's statement that "[e]ach of the above required certificates shall also provide" the specified endorsement plainly meant that the form endorsement would have to be procured *in addition to* the general coverage, "completed operations" and other endorsements the subcontract specified. Contrary to Safety Control's argument, the subcontract was not ambiguous in this respect. Accordingly, we agree with the superior court that as a matter of law, the subcontract required Safety Control to procure "completed operations" coverage for DBA.

 ¶ 37 Safety Control argues, however, that because DBA accepted Safety Control's insurance and approved Safety Control's work without objection, DBA either waived any deficiency or impliedly agreed that Safety Control provided the proper insurance coverage. This argument fails because the subcontract includes two provisions specifying that any act or failure to enforce a provision by DBA does not constitute a waiver of Safety Control's obligations to obtain the required coverage.

 ¶ 38 Safety Control finally argues the superior court erred by holding that its breach of contract may render it liable for the stipulated judgment. As noted, DBA does not allege that Safety Control breached any indemnity obligation under the contract; DBA alleges only that Safety Control breached by failing to procure "completed operations" coverage for DBA. This means that, by contrast to damages that may be owed by an insurer or indemnitor under *Damron* or *Morris,* the amount for which Safety Control may be liable would not be measured by the stipulated judgment, but by the amount that would have been payable under the "completed operations" coverage Safety Control failed to provide. *See Frank Coluccio Constr. Co. v. King County,* 136 Wash.App. 751, 150 P.3d 1147, 1155 (2007) (damages for breach of obligation to provide insurance coverage is the "amount that would have been covered by insurance").[6]

¶ 39 Accordingly, on remand, the superior court shall modify the judgment to make clear that Safety Control may be liable only for damages caused by its failure to procure completed operations coverage for DBA. Safety Control argues that because, as we have held, the accident in which Roman was injured occurred during Safety Control's "ongoing operations" on the road project, the accident could not have arisen out of Safety Control's "completed operations" because those two types of coverages apply in distinctly different circumstances. We leave that issue for the superior court to address in the first instance on remand.

---

**6.** We express no opinion of the amount of damages for which the finder of fact might determine Safety Control is liable on this claim, except to note that in the end, Roman may recover from all sources no more than the stipulated judgment, costs and fees.

## CONCLUSION

¶ 40 Although, as stated above, we have affirmed several rulings of the superior court, we reverse the judgment against EMC and remand for further proceedings consistent with this opinion to determine whether the stipulated judgment is a liability that arose out of Safety Control's ongoing operations, within the meaning of the EMC policy. In addition, we affirm the superior court's judgment against Safety Control but remand so that the court may clarify the circumstances under which Safety Control may be liable for damages and conduct whatever further proceedings it deems appropriate to ascertain the amount of those damages, if any. We decline all parties' requests for attorney's fees pursuant to A.R.S. § 12–341.01 without prejudice to a request for fees incurred in this appeal to be filed by the prevailing party on remand before the superior court.

CONCURRING: PATRICIA A. OROZCO and MAURICE PORTLEY, Judges.