NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

JOHN G. HOLM, MD, et al., *Plaintiffs/Appellees,*

*v.*

GATEWAY ANESTHESIA ASSOCIATES PLLC, et al.,
*Defendants/Appellants.*

No. 1 CA-CV 16-0673
FILED 2-8-2018

Appeal from the Superior Court in Maricopa County
No.  CV 2012-015741
The Honorable James T. Blomo, Retired Judge
The Honorable Sally Schneider Duncan, Judge

**AFFIRMED**

COUNSEL

Sherman & Howard LLC, Scottsdale
By Brian M. Mueller
*Counsel for Defendants/Appellants*

Tiffany & Bosco PA, Phoenix
By Tina M. Ezzell
*Counsel for Plaintiffs/Appellees*

**MEMORANDUM DECISION**

Judge Jennifer B. Campbell delivered the decision of the Court, in which Presiding Judge Michael J. Brown and Judge Jennifer M. Perkins joined.

**C A M P B E L L**, Judge:

¶1    Gateway Anesthesia Associates PLLC, et al. ("Gateway") appeals from the superior court's pre-trial, trial, and post-trial rulings regarding a dispute over employment agreements with their former employees, anesthesiologists Dr. John Holm and Dr. Lee Weiss (collectively, "Doctors"). For the reasons explained, we affirm.

**FACTS AND PROCEDURAL BACKGROUND**

¶2    In October 2012, Dr. John Holm and Dr. Lee Weiss filed a complaint against their former employer, Gateway, an entity that coordinated anesthesiology services for medical providers. Doctors both started working for Gateway in 2010 after each signed a separate but identical two-year "non-member" employment agreement with Gateway. In their complaint Doctors alleged that under the contracts, they agreed to pay membership buy-in payments in anticipation of receiving offers of membership at the end of the contract term. *See infra* ¶ 4. Additionally, they alleged that during contract negotiations, Gateway's president told them they would become members ("partners") in Gateway upon completion of the two-year contracts.[1] The complaint also stated that about three or four months prior to the end of their contracts, Gateway verbally informed Doctors that it did not intend to make them partners, or renew their employment contracts.[2]

¶3    The complaint further stated that Weiss left prior to the end of the two-year agreement, with Gateway's consent, and he had not been

---

[1] We use "partners" interchangeably with "members," as did the superior court.

[2] Gateway does not allege that Doctors were "terminated" in accordance with the termination provisions contained in their employment contracts.

terminated within the meaning of his employment agreement. The complaint also alleged Gateway later released Holm from employment two weeks prior to the completion of the two-year agreement, to avoid reimbursing him the buy-in payments. Doctors alleged, under these circumstances, they were both entitled to reimbursement of their buy-in payments, which Gateway denied.

¶4 Prior to the jury trial, Doctors moved to reform each of their contracts with Gateway, asserting "[t]he contracts as written [did] not clearly reflect the preexisting agreements and mutual intent of the parties." They alleged that prior to signing the contracts each doctor discussed their compensation with Dr. Jon Nottingham, then president of Gateway, and, in Holm's case, also Dr. Brian Delisio, the subsequent president. They claimed Nottingham explained to Doctors that Gateway utilized a three pool-system of compensation for its physicians (the "eat what you kill pool," "the CRNA pool," and the "first call or OB pool").[3] Further, Doctors alleged they were told they would be paid equally "like partners" under the three-pool system with two exceptions: a 10% founders' fee deducted from the CRNA pool; and buy-in payments equaling 20% of their gross pay during their first year of employment, and 10% during their second year of employment.[4] Doctors argued the buy-in payments were for capital

---

[3] The following facts are not in dispute. Nottingham designed the three-pool system to fairly compensate all of its physicians. Under the "eat what you kill pool" the physicians kept the money generated from cases they did themselves. The CRNA pool refers to the money generated from supervisory services provided by Gateway anesthesiologists in which, on a rotating basis, an anesthesiologist would supervise two to four nurse anesthetists; Gateway pooled the revenues and compensated all anesthesiologists, including non-members, equally under this pool. The first call/OB pool refers to revenues generated by Gateway's physicians when they provided 24-hour first-call services, and during that time obstetric services, and under which Gateway pooled the revenues and compensated all physicians, members and non-members, according to the number of first-call shifts a physician worked.

[4] Doctors agree that they had not initially discussed the founders' fees, but that Doctors later agreed to it before signing their agreements. Doctors did not claim that they were entitled to reimbursement of the founders' fee.

contributions toward eventual partnership upon successful completion of two full years of employment at Gateway.

¶5        Additionally, Doctors claimed the contracts as written were ambiguous because they stated that Doctors would be paid based on "net collections" for their services, and did not expressly define "net collections" as the three-pool system of compensation described above. They alleged Gateway eventually "seized" upon the ambiguous wording of their contracts to reduce their compensation and to deny them the compensation agreed to above. Doctors asked the court to determine "that the portion of the parties' contract relating to compensation be reformed in line with the agreements made before they signed written agreements and that [the compensation portions of their contracts that referred to] 'net collections' means payments as the members of Gateway were paid, under the pool system." Gateway opposed the motion.[5]

¶6        Before the jury trial, and without considering Doctors' amended complaint, the court held a hearing and issued rulings on several motions for partial summary judgment by Gateway. First, the court denied Gateway's partial summary judgment motion regarding Doctors' breach of contract claims based on paragraph 7, the buy-in provisions of the contracts. As discussed more below, the court found that "based on the plain language" of paragraph 7 there was a genuine issue of material fact as to whether Doctors were entitled to reimbursement of the buy-in payments.

¶7        The court, however, granted Gateway's motion for partial summary judgment on two issues, specifically finding the contract did not contain provisions entitling Doctors to: 5.3% assessments and 12.8% assessments Gateway had taken out of the first call pool and distributed to its partners, but not Doctors; or, a portion of revenues generated by a non-partner physician hired after Doctors (the "Spangler revenues") that Gateway had split among partners, but not Doctors.

_____

[5] The court denied Doctors' motion because their complaint did not include reformation in its prayer for relief. Doctors amended their complaint and included a request for judgment against Gateway "[f]or reformation of the written contracts between Gateway and [Doctors] to reflect the actual agreements reached by the parties."

¶8          The court later heard oral arguments after Gateway and Doctors each moved for partial summary judgment on Doctors' reformation claims. Doctors again argued the parties intended and agreed that they would be paid like partners, and thus, the contract should be reformed to change the compensation portion of their separate written contracts to reflect the intention of the parties. Doctors further identified compensation they alleged that they ought to have received if they had been "paid like partners."

¶9          The court granted summary judgment in favor of Doctors' reformation claims and denied Gateway's summary judgment motions. The court found Doctors had "proven by clear and convincing evidence that the parties had a meeting of the minds and that the written contracts do not accurately reflect the agreement due to mutual mistake" and thus "reformation [was] appropriate to ensure that the [p]arties' agreement is accurately reflected in the contract."

¶10         Gateway moved for clarification of the ruling and the court issued a minute entry stating "the [c]ourt's ruling dealt with the issue that the written contract should mirror the oral agreement, which it did not. The oral agreement was that the two individuals were to be paid like partners." The court further directed that the parties "will need to find a way to represent it to the jury so they can make a determination as to whether they were paid like a partner."

¶11         Based on the court's reformation ruling, instead of altering the contract, the parties entered into stipulations before the start of the jury trial. The parties first stipulated to Doctors' damages, "amounts owed." This consisted of: (1) 5.3% and 12.8% assessments from the first pool, (2) Spangler revenues, (3) Gateway's budget surplus, (4) a stipend from Ironwood Hospital, (5) post-employment payments, (6) and the buy-ins, should the jury find in favor of Doctors' breach of contract claims or their breach of the implied contractual covenant of good faith and fair dealing claims. Second, the parties also stipulated that after the jury trial, the court would later determine whether any of the stipulated damages were subject to trebling. The court did not reform the portion of their employment agreements dealing with the buy-ins because the pretrial evidence supported the contention that the parties had not discussed reimbursement of the buy-ins prior to signing the agreements.

¶12         Two of Doctors' claims were presented to the jury. First, Doctors argued Gateway breached paragraph 7 of their contracts, addressing the "Membership Buy-in" payments. Specifically, Doctors

asserted Gateway withheld excessive buy-in payments and breached the agreements when it refused to reimburse Doctors all the buy-in amounts at the end of their employment. Doctors also presented their respective claims for breach of the covenant of good faith and fair dealing based on the membership buy-in provision and Gateway's failure to tender return of their buy-in payments upon separation. A jury later returned verdicts in favor of each of Doctors' claims. Doctors' damages for both claims, decided by the jury, were reimbursement of their buy-in payments.

¶13 The court later found that the stipulated damages, except for the buy-ins and the post-employment payments, were treble damages. It awarded Weiss damages in the amount of $442,182.12, attorney fees in the amount of $142,981.35, and costs in the amount of $11,571.83. It also awarded Holm damages in the amount of $439,123.80, attorney fees in the amount of $142,981.35, and costs in the amount of $11,571.83.

## DISCUSSION

### I. Reformation

¶14 Gateway appeals the superior court's summary judgment in favor of Doctors' reformation claims.[6] Applying de novo review, we affirm the superior court's ruling. *See Strojnik v. Gen. Ins. Co. of Am.*, 201 Ariz. 430, 433, ¶ 10 (App. 2001) (we review the superior court's grant of summary judgment de novo).

¶15 Summary judgment should be granted when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Id.* "Summary judgment is appropriate when there is no substantial evidence to support an alleged factual dispute . . . because, even conceding its truth, it leads to an inevitable legal conclusion against its proponent." *Hill-Shafer P'ship v. Chilson Family Tr.*, 165 Ariz. 469, 472 (1990). On review, we examine the evidence presented to the superior court when

---

[6] Gateway also appeals the denial of its separate summary judgment motions on each of Doctors' reformation claims. This court does not generally review the denial of a summary judgment motion unless it is on a point of law. *Strojnik v. Gen. Ins. Co. of Am.*, 201 Ariz. 420, 433, ¶ 11 (App. 2001). Moreover, we do not address the court's refusal to grant Gateway's summary judgment motions because we affirm the court's grant of summary judgment in favor of Doctors.

it addressed the motion.[7] *Brookover v. Roberts Enter's, Inc.*, 215 Ariz. 52, 55, ¶ 8 (App. 2007). We also review the evidence in the light most favorable to Gateway, the non-prevailing party. *Strojnik,* 201 Ariz. at 433, ¶ 10.

**¶16**　　　　"A party seeking reformation of a written agreement must show that a definite [i]ntention on which the minds of the parties had met pre-existed the written instrument and that [a] mistake occurred in its execution." *SWC Baseline & Crismon Inv'rs, L.L.C. v. Augusta Ranch Ltd. P'ship*, 228 Ariz. 271, 279, ¶ 18 (App. 2011) (citation omitted); *see also State v. Ashton Co.*, 4 Ariz. App. 599, 602 (1967) ("Mistake, as the word is used in connection with reformation, is a state of mind not in accord with the facts."). The party seeking reformation has the burden of establishing the elements of reformation by clear and convincing evidence. *Long v. City of Glendale*, 208 Ariz. 319, 331-32, ¶ 47 (App. 2004); *see also McNeil v. Attaway*, 87 Ariz. 103, 110 (1959) ("In a suit to reform a written instrument a clear and convincing showing of the real agreement of the parties thereto is a requisite.").

**¶17**　　　　Doctors testified, in deposition, that Nottingham explained how they would be compensated before they were hired and before they signed their contracts. Doctors both testified that during contract negotiations, Nottingham said they would be paid like partners, with the exception of the buy-in payments. In his deposition, Nottingham verified that he talked to Weiss, and although he did not recall talking to Holm he did not dispute having done so—thus, Holm's testimony that they also discussed compensation is not a material fact genuinely in dispute.

**¶18**　　　　In his deposition, Nottingham testified he did not remember what he specifically told Weiss regarding how he would be compensated, but that he would have told him what he "standardly" explained to other physicians hired under the same employment agreement, which is:

> [T]hey would become partners -- they would join our group; that they would have the same call, the same number of first calls through whatever number; that their cases would be assigned as an equal participant in the group; that their holidays would be approximately the same number as the

---

[7] We therefore do not consider Gateway's or Doctors' summary judgment arguments pertaining to trial testimony subsequent to the court's ruling.

other members of the group; and that their average income would be the same as other members of the group in that they would receive the same opportunity to do cases as other members, but that they had a 20 percent withhold from their income the first year and a 10 percent withhold from their income as a buy-in to the group.

¶19       Nottingham later elaborated:

> I would assume that . . . I said 20 percent and 10 percent [buy-in payments], and that everybody who works as a physician knows that they're going to share the expenses that go along with operating. They were not going to be asked to share anything that the other people in the group, to my knowledge, were going to -- would share. So we all shared equally. Everything was equal except for the 20 percent and 10 percent [buy-in payments].

In Nottingham's deposition, he testified that he explained the contract to Weiss as he "thought it was written." Although Nottingham did not recall telling this to Holm, he did not dispute that he routinely told physicians hired by Gateway they would be paid like partners with the buy-in exception. This testimony supports the conclusion that the parties intended that Doctors would be paid like partners, as described above.

¶20       Further, Holm testified that Delisio also explained he would be paid like a partner, except for the buy-in payments. Delisio did not dispute this at his deposition:

> [Counsel:] Am I understanding you correctly that you basically told [Doctors] that they would be compensated like the partners were except that they would get 20 percent off their gross in the first year and 10 percent off their gross income in the second year?
>
> [Delisio:] Yes, I believe that's essentially what we had discussed; that they would be compensated in a similar fashion to everybody else with the exception of their administrative fees.
>
> [Counsel:] When you say "administrative fees," do you mean the buy-in fees?

[Delisio:] Administrative fees, yes.[8]

**¶21**      Delisio also testified that he would not have misled Doctors about how they were to be compensated, and that at the time Doctors signed their agreements, he "didn't put it together" that the compensation system he explained was not what was reflected in their employment agreements. Again, Delisio's deposition testimony shows no genuine issue of material fact regarding the mistake in the contract language.

**¶22**      The record fails to show a genuine issue of material fact, leading to the conclusion that all parties to the contract intended Doctors to be paid like partners, except for the buy-ins and the later agreed upon founders' fee. Even viewing the evidence in the light most favorable to Gateway, Doctors' testimony is undisputed.

**¶23**      Gateway raises several arguments in opposition to the superior court's grant of summary judgment on Doctors' reformation claims. Gateway contends there is no evidence of what "paid like a partner" meant and thus any reference to being paid like a partner simply represented "preliminary and general negotiations, rather than a legal 'meeting of the minds.'" We disagree. As discussed, the undisputed evidence establishes what being paid like a partner meant: being paid the same as a partner, except for the buy-ins and the later agreed upon founders' fee. This agreement was sufficiently specific in explaining how Doctors would be compensated. *See Leflet v. Redwood Fire & Cas. Ins. Co.*, 226 Ariz. 297, 302, ¶ 22 (App. 2011) (enforceable contract requires "an offer, an acceptance, consideration, and *sufficient specification of terms so that the obligations involved can be ascertained*") (citations omitted). Moreover, Nottingham's and Delisio's testimony that they believed the contracts reflected this agreement contradicts any argument that the parties were engaged in preliminary negotiations.

**¶24**      Gateway next argues there was no "intent" because "[t]he parties never agreed to, or even discussed, the specific amounts claimed by [Doctors]." Here, it is immaterial whether the parties discussed the specific amounts, discussed below, *infra* ¶ 54, because the superior court properly

---

[8] The record reflects that Delisio did not talk to Weiss about his compensation until after Weiss had signed his contract. Nonetheless, Delisio's testimony that he continued to tell Doctors that they would be compensated like partners, minus the buy-in payments and founders' fee, supports Doctors' argument that the parties intended that they would be paid as such.

concluded that the agreement, understood by Doctors and Gateway, required the Doctors to be "paid like partners" and thus was sufficiently specific.

¶25        Gateway also argues there was "[no] evidence of any mistake of any kind in the execution of the Agreement by either [Doctors] or Gateway," essentially, because both parties believed the contract reflected their agreement. Gateway points to: deposition testimony by Holm that he was unable to identify a "mistake" in the contract; Weiss' deposition testimony that he reviewed his contract with Nottingham who confirmed, and represented, that what he offered was in the contract; Doctors' separate testimony that no one at Gateway told them there was a mistake in their contracts; and Nottingham's deposition testimony that he believed the contract was consistent with the compensation method he described, aside from the founders' fee. As discussed, the purpose of reformation is to correct a mistake that occurs when, as here, the parties' intent is not in accord with the written document. *Supra* ¶ 16. Gateway claims that this evidence demonstrates a unilateral mistake by Holm and Weiss. However, the deposition testimony of Nottingham and Delisio does not support this assertion. *Supra* ¶¶ 17-21.

¶26        Finally, Gateway argues that the integration clauses in the contracts legally precluded Doctors' reformation claims, or, at least created a presumption that the contracts reflected a fully integrated agreement between the parties. We disagree that the integration clause bars reformation here, or that it created any presumption in favor of Gateway. The clause at issue in Doctors' contracts states:

> This Agreement constitutes the entire agreement of the parties. All prior agreements between the parties, whether written or oral, are merged herein and shall be of no force or effect. This Agreement cannot be altered, modified or discharged orally but only by an agreement in writing. There are no representations, warranties, or agreements other than those set forth in this Agreement, if any.

¶27        Generally, absent exceptions not applicable here, an integration clause bars the use of parol evidence. *See Formento v. Encanto Bus. Park*, 154 Ariz. 495, 498-99 (App. 1987); *Hill v. Jones*, 151 Ariz. 81, 83 (App. 1986). Reformation, however, is an equitable remedy to correct a written contract when the contract does not reflect the parties' real agreement due to mistake. 76 C.J.S. *Reformation of Instruments* § 1 (2017). The

parol evidence rule does not apply to reformation claims. *Long*, 208 Ariz. at 331, ¶ 44.

**¶28** Doctors' reformation claim is based on mutual mistake and, thus, Doctors do not seek to alter the agreement in the sense of changing what the parties agreed to, but rather to bring it in conformity with what the parties actually agreed. *Isaak v. Mass. Indem. Life Ins. Co.*, 127 Ariz. 581, 584 (1981) ("Reformation is the remedy designed to correct a written instrument which fails to express the terms agreed upon by the parties; it is not intended to enforce the terms of an agreement the parties never made."); 76 C.J.S. *Reformation of Instruments* § 2 ("Reformation, at its essence, acts to correct an error not in the parties' agreement but in the writing which constitutes the embodiment of that agreement.")

**¶29** To hold that an integration clause bars reformation would undermine the purpose of reformation, which is to bring the mistaken instrument into alignment with the parties' real intent. *See McNeil v. Attaway*, 87 Ariz. 103, 110 (1959) ("Proof of [a pre-existing] agreement is essential in a reformation action, since the purpose of such action is to conform the instrument to the actual contract negotiated by the parties); *see also Hackin v. Pioneer Plumbing Supply Co.*, 10 Ariz. App. 150, 158 (1969) (trial court did not err in denying reformation when substantial evidence supported trial court's finding that agreement executed included all terms mutually agreed upon).

**¶30** If we were to adopt Gateway's interpretation of reformation, after a court found by clear and convincing evidence that the proponent of reformation had met its burden, the court would nonetheless enforce a contract as written. If this were the case, there would be no need for reformation in any circumstance. Such a position is at odds with the law of contracts. *See Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 152 (1993) ("Generally, and in Arizona, a court will attempt to enforce a contract according to the parties' intent.").

**¶31** Accordingly, we affirm the superior court's grant of Doctors' motion for summary judgment on their reformation claims.

## II. Denial of Summary Judgment Regarding Buy-ins

**¶32** Gateway appeals the superior court's pre-trial denial of its motion for summary judgment on Doctors' breach of contract claims. *Supra* ¶ 6. Gateway argues that paragraph 7 does not provide for reimbursement of Doctors' buy-in fees "under any sort of circumstances." Rather, as it did in the superior court, Gateway argues that the "terms of the [employment]

[a]greements are plain and clear"; under paragraph 7 if Doctors became members after two years, they would no longer pay buy-in fees and would receive an equal membership in Gateway, and "if [Doctors] did not become Gateway members after two years, they would no longer have to pay the "buy-in" amounts. Exercising de novo review, *Brookover*, 215 Ariz. at 55, ¶ 8, we affirm the superior court's denial of Gateway's motion for summary judgment.[9]

**¶33**     Contract interpretation is a question of law we review de novo. *Grosvenor Holdings, L.C. v. Figueroa*, 222 Ariz. 588, 593, ¶ 9 (App. 2009). To determine the parties' intent, we "first consider the plain meaning of the words in the context of the contract as a whole." *Id*. If the parties' intent "is expressed in clear and unambiguous language, there is no need or room for construction or interpretation and a court may not resort thereto." *Id*. (citation omitted).

**¶34**     Paragraph 7, addressing membership buy-in, states:

> Physician shall have the opportunity to become a Member of Company upon the successful completion of two (2) full years of employment hereunder and upon the appropriate vote in accordance with the Operating Agreement of the Company. It is agreed that Physician shall be responsible for paying to Company an "Administrative Fee" over the first two (2) years of this Agreement, commencing upon the Effective Date as follows: during the first year of Physician's employment, Company shall retain an amount equal to twenty percent (20%) of Physician's Net Collections each month; and during the second year of Physician's employment, Company shall

---

[9] Although the denial of a motion for summary judgment is not generally reviewable on appeal, this court may grant review even after a case has gone to trial if the denial is based on a purely legal issue—meaning the issue "is one that does not require the determination of any predicate facts, namely, the facts are not merely undisputed but immaterial." *Desert Palm Surgical Grp., P.L.C. v. Petta*, 236 Ariz. 568, 577, ¶¶ 21-22 (App. 2015) (citation omitted). Here, the superior court based its finding on a purely legal issue: that the plain language of paragraph 7 was ambiguous. *See In re Estate of Lamparella*, 210 Ariz. 246, 250, ¶ 21 (App. 2005) (whether contract language is reasonably susceptible to more than one interpretation is a question of law for the court).

retain an amount equal to ten percent (10%) of Physician's Net Collections each month. The amount retained by Company each month is Physician's "Administrative Fee." It is agreed that the Company will also retain these same percentages (i.e., 20% in the first year and 10% in the second year) of the Physician's share of any CRNA profits. At such time as Physician becomes a Member of the Company, he will be transferred a Membership Interest in [the] Company in a percentage which is equal to all other Members of Company. Should Physician's employment be terminated for any reason prior to the completion of such two (2) year terms, then he shall not be entitled to any interest in Company or to any of the [buy-in] Fees paid by Physician to Company as set forth hereinabove. In addition to the foregoing, should Physician not become Board-certified in Anesthesiology on or before the second anniversary of the Effective Date of this agreement, then the Physician will not become eligible for becoming a Member of the Company at such time, but may become eligible to become a Member at a later date after obtaining such Board-certification. **Further, should Physician not become a Member at the end of the second anniversary from the Effective Date, he will still be entitled to the same Compensation, as described above, however, he shall not be responsible for paying any of the [buy-in] Fee.**

(Emphasis added.) Here, the superior court found that under the contract's plain language, the term "any" in the phrase "he shall not be responsible for paying any of the [buy-in] Fee" was susceptible to more than one meaning. Specifically, the court found that "any" could mean Doctors were not responsible for "all of the [buy-in] fees" paid, meaning if Doctors were not made members they are not "responsible for having paid that into the membership" or, alternatively, "any" could mean that if Doctors were not made members they would not have to pay the fees moving forward. Thus, the court concluded there was a genuine issue of material fact as to whether Doctors were entitled to reimbursement under paragraph 7.

¶35        We agree with the superior court. The contracts, reasonably construed, are ambiguous regarding whether Doctors were entitled to a return of their buy-in fees upon separation from employment with Gateway. The plain language, as identified by the superior court, is

13

reasonably susceptible to both interpretations.[10] *See In re Estate of Lamparella*, 210 Ariz. 246, 250, ¶ 21 (App. 2005) (a contract is ambiguous when its language can reasonably be construed to have more than one meaning).

¶36 Accordingly, the court's denial of summary judgment was appropriate. *See Assoc.'d Students of Univ. of Ariz. v. Ariz. Bd. of Regents*, 120 Ariz. 100, 104-05 (App. 1978) ("Once a contract is determined to be ambiguous, extrinsic evidence may be resorted to for the purpose of ascertaining its real meaning"; "A determination of the surrounding facts, consideration of which is necessary to resolve ambiguities, is for the trier of fact").

¶37 Because we affirm the superior court's denial of Gateway's summary judgment motion on Doctors' breach of contract claims, we need not and do not address Gateway's argument that the superior court erred in denying Gateway's motions for judgment as a matter of law, raised at the close of the parties' cases, on Doctors' claims for breach of the covenant of good faith and fair dealing.[11] *See* Ariz. R. Civ. P. 50(a). The parties' stipulated damages included the buy-ins, and damages relating to not being paid like partners. The jury found that Gateway had breached paragraph 7 of the employment agreements, and thus Doctors were entitled

---

[10] In its briefing before the superior court, Gateway did not argue that Doctors were not entitled to reimbursement under paragraph 7 because they were both "terminated" within the meaning of their employment agreements. Rather, as discussed, Gateway's position in the superior court and on appeal was that it did not owe Doctors reimbursement under any circumstance. Moreover, in their motion opposing summary judgment, Doctors contested whether they were "terminated" within the meaning of their employment agreements. The termination formalities defined in the employment agreements required written 90-day notice for termination without cause or reason, and lists enumerated reasons for termination without notice. The parties disputed Holm's allegation that Gateway later terminated him to avoid having to reimburse him the buy-in payments. The evidence before the court showed only that Delisio provided Holm verbal notice that Gateway would not make Doctors partners or renew their employment agreements due to financial reasons. There is no argument by Gateway nor evidence that Gateway complied with the termination formalities of the employment agreements.

[11] Gateway did not make any pre-trial motion regarding Doctors' good faith and fair dealing claims.

to reimbursement of the buy-in payments. As such, the jury's verdicts that Gateway had breached the covenant of good faith and fair dealing did not result in an award of any additional damages; the damages sought under the breach of contracts claims and breach of the covenant of good faith and fair dealing claims were for reimbursement of the buy-in payments. Moreover, the court later denied Doctors' request for treble damages regarding the buy-ins. Thus, the superior court's denial of Gateway's Rule 50 motion has no impact on the resolution of this appeal, and we decline to address this issue. *Freeport McMoRan Corp. v. Langley Eden Farms, LLC*, 228 Ariz. 474, 478, ¶ 15 (App. 2011) (appellate court does not decide unnecessary issues).

### III.    Arizona Rule of Evidence 404(b)

**¶38**        Gateway next claims that the superior court committed reversible error by allowing evidence of other breaches, wrongs, and conduct between the parties. Gateway identifies eight categories of evidence it claims violated 404(b)'s admissibility requirements. *Infra* ¶ 41. Even if we were to assume, without deciding, that such evidence constituted "other crimes, wrongs, or acts" within the meaning of Rule 404(b), Gateway has waived this argument on appeal.

**¶39**        Under Rule 404(b), "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." If a party fails to timely object to the admission of evidence the party waives the issue on appeal. *See Estate of Reinen v. N. Ariz. Orthopedics, Ltd.*, 198 Ariz. 283, 286, ¶ 9 (2000) ("An objection to proffered testimony must be made either prior to or at the time it is given, and failure to do so constitutes a waiver.").

**¶40**        First, at the start of trial, Doctors' counsel informed the court that the parties had agreed to stipulations, *see supra* ¶ 11, and that she would be presenting some evidence that would be pertinent to the parties' stipulations. This evidence included testimony relating to Gateway's contract negotiations with Doctors and evidence that would be relevant to the court's later determination of the treble damage issues. This statement put Gateway on notice that Doctors would elicit evidence of other issues between the parties. Gateway failed to raise any objection at that time, nor did Gateway file a motion in limine before trial seeking to limit or preclude any of the proffered evidence. *See State v. Duran*, 233 Ariz. 310, 311, ¶ 7 (2013) ("Generally, a defendant preserves for appeal any issues raised in a

motion in limine and ruled upon without the need for further objection at trial.") (citation omitted).

**¶41**        On appeal, Gateway identifies eight categories of evidence it claims constitute reversible error under 404(b): (1) Doctors not being paid as promised; (2) Gateway's "[u]nfair or unequal treatment" of Doctors; (3) promises that Doctors would be made partners; (4) Doctors' expected post-employment payments; (5) The Spangler revenues; (6) Gateway's 5.3% and 12.8% assessments from the first call pool; (7) Gateway's overbilling and double billing; and (8) Gateway's litigation with its billing company and starting its own billing company.

**¶42**        This evidence, however, was relevant to the court's later determination of treble damages, which included Doctors' post-employment payments, the Spangler revenues, and Gateway's 5.3% and 12.8% assessments from the first call pool. Additionally, the remaining evidence, dealing with how Gateway paid Doctors, how it paid its partners, and Gateway's financial struggles, was pertinent to the court's determination of treble damages. *See infra* ¶¶ 54-67. Gateway acknowledged that some of the objectionable facts presented by Doctors were directly relevant to the court's determination whether to award treble damages.

**¶43**        Second, even if Gateway had not agreed to put on some of the treble damages evidence during trial, it failed to adequately object in the superior court and has thereby waived the issues on appeal. Gateway either failed to object as the evidence was presented, or, when it did object, raised specific objections based on "relevance" and not "other acts evidence." Ariz. R. Evid. 401, 404. And while relevance is one factor in a court's 404(b) analysis, *State v. Escalante-Orozco*, 241 Ariz. 254, 278, ¶ 77 (2017), an objection under Rule 401 is insufficient to preserve a Rule 404(b) objection on appeal, *State v. Lopez*, 217 Ariz. 433, 434, ¶ 4 (App. 2008) ("[A]n objection on one ground does not preserve the issue on another ground."). Gateway argues that at the end of the first day of trial, and mid-way through the second day of trial, it made a "record" of its ongoing 404(b) objections thereby preserving the objection. We disagree. Gateway's objections, at best, were general objections, which are insufficient to preserve a challenge to the admission of evidence on appeal. *Lopez*, 217 Ariz. at 434, ¶ 4. "[T]o preserve a challenge to the admission of evidence, a party must make a timely objection or motion to strike . . . stating the specific ground of objection, if the specific ground was not apparent from the context." *Id.* (citation omitted). Here, Gateway's "record" was made at the end of the first day of trial, and again the next day of trial, well after the presentation

of the majority of evidence Gateway now contests. Additionally, Gateway's "record" consisted of counsel's general statement that "all these questions" and "various issues" raised by Doctors' counsel constituted improper bad acts evidence. Accordingly, not only were Gateway's objections untimely, but they lacked the required specificity to preserve the issue for appeal. *Id.*

## IV.   Denial of Jury Instructions[12]

**¶44**        Gateway argues the superior court committed reversible error when it denied six of Gateway's requested instructions. We conclude otherwise.

**¶45**        We review the court's denial of a requested jury instruction for an abuse of discretion, but review de novo whether, considering the instructions as a whole, the instructions were legally sufficient. *State v. Causbie*, 241 Ariz. 173, 177, ¶ 15 (App. 2016). We also review de novo whether the evidence supports a requested instruction, as a party is entitled to a jury instruction on any theory supported by reasonable evidence. *State v. Almeida*, 238 Ariz. 77, 80, ¶ 9 (App. 2015).

**¶46**        Gateway argues the court should have given three instructions to combat "prejudice" that arose following the introduction of "inadmissible" 404(b) evidence. *See supra* ¶ 41. Gateway first requested the following instruction: "[y]ou may not consider evidence of a person's other acts or wrongs to prove that person acted in conformity with the acts or wrongs." Gateway's requested instruction, however, is an incomplete statement of the law under Rule 404(b). *See supra* ¶ 39. Gateway is not entitled to an instruction that would have misled the jury. *State v. Rosas-Hernandez*, 202 Ariz. 212, 220, ¶ 31 (App. 2002) (jury instructions must not mislead the jury).

**¶47**        Second, Gateway also requested the following instruction:

> The [c]ourt has made several rulings in this case which bind your deliberations and limit your findings. One of those rulings was that, under the parties' written employment agreements as they existed prior to the [c]ourt's reformation to include the phrase "paid like a partner," neither Dr. Holm nor Dr. Weiss were entitled to recover any amounts regarding (i) revenues generated by Dr. James Spangler, a Gateway

---

[12] In reviewing the denial of a jury instruction, we view the evidence in the light most favorable to the proponent of the instruction. *State v. Almedia*, 238 Ariz. 77, 77-78, ¶ 2 (App. 2015).

contract physician; and (ii) the 5.3% assessment and then the 12.8% assessment against revenues of the "First Call Pool."

**¶48**       The court properly instructed the jury that its previous rulings had no bearing on what the jury must decide in the case. Thus, the court did not err in declining the instruction. *Rosas-Hernandez*, 202 Ariz. at 220, ¶ 31; *see also State v. Speers*, 209 Ariz. 125, 132, ¶ 27 (App. 2004) (it is error to instruct a jury on issues or theories not supported by evidence "because it invites the jury to speculate as to possible non-existent circumstances") (citation omitted).

**¶49**       Third, Gateway requested the following instruction: "Dr. Holm and Dr. Weiss were 'at-will' employees with Gateway. An at-will employment can be terminated at any time for good cause or no cause at the will of either party." The requested instruction is misleading because neither wrongful termination nor allegations Doctors were entitled to become partners were issues for the jury to decide. *Rosas-Hernandez*, 202 Ariz. at 220, ¶ 31.

**¶50**       Next, Gateway requested the following two instructions:

> A mistake of only one of the parties to a contract in the expression of his agreement or as to the subject matter does not affect its binding force and ordinarily affords no ground for its avoidance, or for an award of damages.

> If you find that one of the parties had an intention as to a meaning of a contract provision or term and did not disclose that intention to the other party to the contract, that undisclosed intent is irrelevant and should not be considered.

The court found that neither instruction would be "beneficial" or would "assist" the jury. We agree. The court provided instructions from the Revised Arizona Jury Instructions ("RAJI") (Civil) Contract (5th ed. 2013), that adequately explained the law regarding the issues to be decided by the jury, and thus, did not err in declining the instructions. *State v. Rodriguez*, 192 Ariz. 58, 61, ¶ 16 (1998) (on review, this court looks to whether instructions adequately set forth the law applicable to the case). Specifically, as to the claims, the court provided RAJI 16, 26, and 27.

**¶51**       Lastly, Gateway requested the court add the following paragraph to the standard instruction on good faith and fair dealing under RAJI 16:

[A]cts that comply with the terms of the contract cannot, without more, be equated with bad faith. The duty of good faith and fair dealing must relate to existing contract terms, and does not impose additional obligations upon a party that are outside of the contract.

**¶52**        Again, the requested instruction would have misled and confused the jury about what, under Arizona law, constitutes a breach of the duty of good faith and fair dealing.[13] As such, there was no obligation on the court to grant Gateway's request and the instruction the court did provide adequately instructed the jury on that issue. *See Rodriguez*, 192 Ariz. at 61, ¶ 16.

**¶53**        Accordingly, the superior court did not err in declining each of Gateway's requested instructions.

## V.    Treble Damages

**¶54**        Per the stipulations, the parties agreed that if the jury returned verdicts in favor of Doctors, the superior court would determine whether the following stipulated damages should be levied as treble damages: (1) 5.3% and 12.8% assessments from the first pool, (2) Spangler revenues, *see supra* ¶ 7, (3) Gateway's budget surplus, (4) a stipend from Ironwood Hospital, (5) post-employment payments, (6) and the buy-ins. We conclude the superior court did not abuse its discretion in its award of treble damages. *See Schade v. Diethrich*, 158 Ariz. 1, 14 (1988) (appellate court

---

[13] Under Arizona law, there is an implied covenant of good faith and fair dealing in every contract. *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Tr. Fund*, 201 Ariz. 474, 490, ¶ 59 (2002) ("Such implied terms are as much a part of a contract as the express terms.") (citations omitted). "The implied covenant of good faith and fair dealing prohibits a party from doing anything to prevent other parties to the contract from receiving the benefits and entitlements of the agreement." *Id.* This court has previously stated, "a party can breach the implied covenant of good faith and fair dealing both by exercising express discretion in a way inconsistent with a party's reasonable expectations and by acting in ways not expressly excluded by the contract's terms but which nevertheless bear adversely on the party's reasonably expected benefits of the bargain." *Bike Fashion Corp. v. Kramer*, 202 Ariz. 420, 424, ¶ 14 (App. 2002) (citation omitted).

reviews the superior court's award of treble damages for an abuse of discretion).

¶55 Section 23-355(A) states, absent an exception not applicable here, "if an employer, in violation of this chapter, fails to pay wages due any employee, the employee may recover in a civil action against an employer or former employer an amount that is treble the amount of the unpaid wages." Under A.R.S. § 23-352(3), an employer's withholding or diverting of wages is not subject to trebling if the employer had a reasonable good faith dispute as to the amounts owed. *Apache E., Inc. v. Wiegand*, 119 Ariz. 308, 312 (App. 1978) (a penalty will not be imposed when there is a good faith dispute over unpaid wages). If, however, there does not exist a reasonable good faith dispute, the court has discretion to award treble damages pursuant to A.R.S. § 23-355. *D'Amico v. Structural I Co.*, 229 Ariz. 262, 266, ¶ 17 (App. 2012). In doing so the court may consider "the origin and nature of the dispute, efforts one party or the other made to resolve the dispute short of litigation, the nature of the relationship between the employer and employee, and other contemporaneous acts by either party not bearing directly on the alleged breach of contract." *Id.* at 266, ¶ 17.

¶56 At the time of this action, under A.R.S. § 23-352 and A.R.S. § 23-355(A), the Legislature defined "wages" to mean:

> [N]ondiscretionary compensation due an employee in return for labor or services rendered by an employee for which the employee has a reasonable expectation to be paid whether determined by a time, task, piece, commission or other method of calculation. Wages include sick pay, vacation pay, severance pay, commissions, bonuses and other amounts promised when the employer has a policy or a practice of making such payments.[14]

A.R.S. § 23-350(6) (2012); *See also Schade*, 158 Ariz. at 13.

¶57 Gateway appeals the superior court's findings, based on the parties' briefing and arguments, of the following treble damage judgments:

---

[14] We cite to the statute in effect at the time of this action, as the Legislature, subsequent to this action, renumbered and amended the statute by omitting the last sentence of the quoted provision above. 2016 Ariz. Sess. Laws, ch. 203, § 2 (Sec. Reg. Sess.)

(1) 5.3% and 12.8% assessments from the first pool; (2) Spangler revenues; (3) Gateway's budget surplus; and (4) the Ironwood stipend.

**i. First Pool Assessments and Spangler Revenues**

**¶58** We address the assessments and Spangler revenues together because Gateway raises the same arguments about each category. It is undisputed that Gateway began to withhold assessments of 5.3% and then 12.8% from the revenues generated by the "first call pool" from Doctors, and other new physicians, and Gateway split the revenues from the assessments only among the members of Gateway.[15] It is also undisputed that the partners and Doctors shared the expenses for Dr. Spangler, a non-partner salaried physician hired subsequent to Doctors' employment, but that Gateway split a portion of Dr. Spangler's revenues among its members and not Doctors.

**¶59** Gateway contends the assessments and the Spangler revenues were not "wages," but rather "partnership profits." The court, however, did not abuse its discretion in determining that they were "wages." Gateway agreed to pay Doctors like partners except for the founders' fee and the buy-in payments, and thus, the assessments and Spangler revenues were compensation Doctors reasonably expected in return for their services as all members enjoyed this increase in earnings.

**¶60** The court also did not err in concluding Gateway lacked a reasonable good faith basis to withhold these wages. Gateway first attempts to frame its failure to pay Doctors the return of the additional wages as a "mistake" made in "hindsight." Gateway's position ignores the consequences of Doctors' successful claim for reformation, which, as discussed, under Arizona law requires "a definite [i]ntention on which the minds of the parties had met pre-existed the written instrument and that the mistake occurred in its execution." *Ashton Co.*, 4 Ariz. App. at 602. Thus, Gateway's attempt to reframe its failure to pay Doctors as partners—which would include the assessments and Spangler revenues—as a "mistake" in which it "turned out to be wrong" is precisely what the Court determined; they withheld wages without good cause. Had Gateway been diligent in correcting the "mistake" this issue would not be the subject of litigation.

---

[15] The assessments here differ from the founders' fee and the buy-ins, and were taken from the first call pool. They were implemented by Gateway's board in 2012 after Nottingham stepped down as president.

**¶61** Second, Gateway also argues the superior court's pre-reformation ruling granting partial summary judgment in favor of Gateway regarding the assessments and Spangler revenues, *supra* ¶ 7, demonstrates that it had a reasonable good faith dispute regarding payment of any of the disputed amounts. Gateway reasons the court "would not have entered the [o]rder, finding that Gateway did not owe [Doctors] any amounts related to the Assessments [or the Spangler revenues] if Gateway was 'inappropriate and unreasonable.'" We also reject this argument. As Doctors point out, Gateway misrepresents the court's rulings; the court did not find that "Gateway did not owe" the assessments or Spangler revenues as Gateway contends. The court denied Gateway's motion for partial summary judgment on Doctors' unjust enrichment claims, *infra* n. 16, and specifically cited the assessments and the Spangler revenues as justification for the denial. Accordingly, there is no basis for Gateway's position that the court's rulings demonstrated that Gateway had a "reasonable" good faith reason for withholding these amounts. *See Wang Elec., Inc. v. Smoke Tree Resort*, LLC, 230 Ariz. 314, 318, ¶ 10 (App. 2012) ("[U]njust enrichment provides a remedy when a party has received a benefit at another's expense and, in good conscience, the benefitted party should compensate the other.").

## ii. Gateway's Budget Surplus

**¶62** Gateway deducted from all partners and Doctors, with Doctors' consent, a set monthly amount to pay for specified and agreed upon overhead expenses. Gateway later discovered it had deducted much more than was needed to cover the overhead, yielding a budget surplus of $60,000. Gateway's partners then voted to distribute the surplus among the partners only and to exclude the Doctors from the distribution. On appeal, Gateway argues the surplus reflected discretionary "profits," not wages, because Gateway did not have a "stated policy or procedure about how to handle a budget surplus."

**¶63** Gateway does not dispute Doctors' contention that the deductions were to be used to pay for overhead expenses only. We reject Gateway's attempt to frame the surplus as discretionary "profit" and its attempt to hide behind a lack of "policy or procedure" for what it admits was a unique occurrence. Gateway points to no evidence to justify its decision to split the surplus among only its partners, nor does Gateway claim Doctors provided consent to the distribution. Given the circumstances in which Gateway obtained the surplus the court did not err in finding Doctors' surplus damages were wages and trebling the damage award. *See* A.R.S. § 23-350(6) (wages include non-discretionary

compensation in return for services that an employee has a reasonable expectation to get paid, including as determined by other method of calculation).

¶64        Similarly, we reject Gateway's argument that "it [was] not bad faith to make a distinction between members . . . and non-members" in deciding to pay the budget surplus only to its partners. Gateway only procured the surplus because it withheld the amounts from the wages of Doctors and others. In light of the fact that they withheld much more than was needed to cover overhead expenses, it was bad faith to then distribute the surplus to partners only and not to Doctors who had contributed a similar amount.

### iii. Ironwood Stipend

¶65        Gateway entered into a contract with a new hospital, Ironwood. The hospital paid for anesthesia coverage services via a monthly stipend paid the month after Gateway physicians rendered services. Because the hospital was just opening, they paid a stipend to supplement the physicians who would not have the steady stream of patients they would attend to at a more established venue. The revenues that Doctors and other Gateway physicians earned from working first call shifts at Ironwood hospital were put into the first call pool and divided, pro rata, based on the number of shifts that each contributing physician worked. Doctors alleged that Gateway did not pay Doctors their share of the Ironwood stipend earned during their last months of work, but paid by Ironwood after they left.

¶66        On appeal, Gateway does not contest that the Ironwood stipend constituted wages. Instead, Gateway asserts it had a "good faith basis to dispute [Doctors'] claims to the Ironwood stipend by relying upon, and performing under, the written provisions of paragraph 10" of Doctors' employment agreements addressing Doctors' compensation upon termination of employment. Gateway fails to support its position with any citations to the record, nor does it explain how compliance would demonstrate good faith in withholding Doctors' share of the Ironwood stipend. Accordingly, because Gateway only argues its "performance" under paragraph 10 demonstrates good faith, this issue is not properly before this court and is waived on appeal. *See Boswell v. Fintelmann*, 242 Ariz. 52 n.3, ¶ 7 (App. 2017) (failure to develop and support conclusory arguments waives appellate review); ARCAP 13(7)(a).

**¶67** Accordingly, the superior court did not abuse its discretion in finding the assessments, Spangler revenues, budget surplus, and Ironwood stipend were treble damages.

### CONCLUSION[16]

**¶68** For the foregoing reasons, we affirm the rulings of the superior court. As the prevailing parties, we also award Doctors their costs, A.R.S. § 12-341, and attorney fees on appeal, A.R.S. § 12-341.01, contingent upon their compliance with ARCAP 21.



AMY M. WOOD • Clerk of the Court
FILED: AA

---

[16] Because we affirm the rulings of the superior court, Gateway's appeal of the superior court's pre-trial ruling rejecting Gateway's motion for partial summary judgment on Doctors' unjust enrichment claims, which did not go to the jury, is moot and we do not address it.